John J. DUFFY,

v.

Samuel C. BRODY

and

UNITED STATES of America

v.

Samuel C. BRODY.

Nos. 55-67-A, 56-29-A.

United States District Court
D. Massachusetts.

Jan. 11, 1957.

Anthony Julian, U. S. Atty., Andrew A. Caffrey, George H. Lewald, Asst. U. S. Attys., Boston, Mass., for plaintiffs Duffy and U. S.

Arthur Gottlieb, Harold G. Jackson, Boston, Mass., for defendant Brody.

ALDRICH, District Judge.

This is a hearing originally held December 11, 1956 for criminal contempt for failure to obey two orders of the court dated January 10 and July 12, 1956. On December 27, after my findings against defendant had been announced, counsel's argument on sentence suggested that he had failed to introduce available evidence regarding the Fifth Amendment, possibly due to neglect, and I reopened the case. Some of the background to this proceeding is contained in the opinion denying Brody's motion to dismiss, reported D.C., 144 F.Supp. 749, and need not be repeated. There are two pending actions. The first, brought by one Duffy, Acting Group Supervisor of the Internal Revenue Service, pursuant to 26 U.S.C.A. (I.R.C.1954) § 7604, is the one in which the two orders were entered. After Brody failed to comply with the January 10 order the government, on June 11, brought the second proceeding, to have him held in criminal contempt under 18 U.S.C.A. § 401. There has been added by the court, on its own motion, MacNeil v. United States, 1

Cir., 236 F.2d 149, a charge of criminal contempt for failure to comply with the July 12 order. It was stipulated that due notice was given of the hearing and of the charges and, out of abundance of caution in case compliance with 26 U.S. C.A. (I.R.C.1954) § 7604(b) was required, Brody expressly waived arrest.

I find that on November 4, 1955 the Internal Revenue Service issued a jeopardy assessment against Brody for unpaid income taxes for the years 1942–46 in the amount of $663,000, and demanded payment. Civil proceedings were already pending in the Tax Court, based upon fraud, but no criminal proceedings had been instituted. Thereafter, between November 9 and November 29, Brody sold over $300,000 in securities for cash. On December 6 Duffy, a duly authorized Agent of the Secretary of the Treasury, summoned him to appear December 16 to testify with relation to his tax liability. Brody instructed his counsel to report on December 14 that he was too ill to attend, and on December 15 left for Florida.

The order of this court of January 10, 1956 in substance required Brody to submit to the Collection Officer under oath: (1) A description of every expenditure by him in excess of $500 since November 4, 1955; (2) The disposition or whereabouts of the proceeds realized by selling his securities aforesaid; (3) A statement as to the assets of the Charles Trust, so called, held by Brody or others, and of Brody's personal assets, by whomsoever held, their present location and value; (4) A weekly statement, until further notice, of his expenditures, and of any change in the information required in pars. 2 and 3. Shortly after this order was issued Brody received a copy of it and discussed it with his counsel; with a Mr. Murray, in person, in Florida, and with Mr. Gottlieb, his counsel of record, over the telephone. He testified he told them he wanted to rely on the Fifth Amendment. "My attorneys will testify I pleaded the Fifth Amendment right from the start." Mr. Murray was present in

court on December 11, having been called by the government as a witness, but he did not so testify. Neither did Mr. Gottlieb. Because of their failure to corroborate him, and for other reasons, I did not believe him, and so stated. On December 27 they offered to testify, and I reopened the hearing.

I find that on January 10 or 11, 1956, Mr. Gottlieb telephoned Brody in Florida about the court's order of January 10; that Mr. Murray was in Florida at Brody's request to discuss his Tax Court case with him; that they spent two days considering the order; that Brody said he did not want to respond to it; that he suggested a number of reasons, which Mr. Murray did not think well of; that he then said he would claim the Fifth Amendment; that Mr. Murray told him that because the statute of limitations had long run on his questioned tax liability he clearly could not claim it, although, of course, if he were in court he could ask the judge, but that a judge could not be expected to uphold him. Brody also discussed the subject over the telephone with Mr. Gottlieb. This discussion ended inconclusively. Brody did not state that he was not going to respond because of the Fifth Amendment; nor, to use his language, did he "plead" it. I find that counsel advised him that such a claim would be dubious at best; that if he were to assert it in response to the order it might have an unfavorable effect upon his greater concern to have the court accept his defense of ill health; that it might cause the court to question his sincerity, and that as a matter of tactics it was better to forgo it altogether. Cf. Attorney General v. Pelletier, 240 Mass. 264, 134 N.E. 407. (Claim of self-incrimination warrants unfavorable inference in civil proceeding.) I do not credit the testimony that counsel advised him he could not claim the Fifth Amendment except in court. It is true that the privilege must be claimed in response to specific questions, and that perhaps it has to be asserted under oath. See Marshall, C. J., in United States v. Burr, C.C.D.Va.,

25 Fed.Cas. 38, No. 14,692e; but cf. Quinn v. United States, 349 U.S. 155, 75 S.Ct. 668, 99 L.Ed. 964. But Brody had already been asked specific questions, by the court, to be answered under oath. Under these conditions the time clearly had come either to answer, or to assert a privilege not to. Brody affirmatively decided not to do the latter, for substantive, not for procedural reasons. In conformity with this I-have-nothing-to-hide policy he authorized Mr. Gottlieb to admit in the answer filed January 28, 1956 to the Duffy petition the very facts which he now claims it would incriminate him to elaborate upon. See discussion infra. I mention this in corroboration, only. I would draw the inference anyway, from other circumstances before and after that date.

The defense which the answer asserted against responding to the summons was ill health. Thereafter the order to answer questions that I issued in lieu of compelling a personal appearance, and which called for response immediately, and weekly thereafter, went unheeded for many months. This was not because Brody's health prevented response. The medical testimony, offered as a second thought at the reopened hearing after I had found against him, left me satisfied beyond a reasonable doubt that at least for extensive periods not only could he have obeyed the order, but he could have done so without danger to his health. Of course as a matter of medical theory it might have been preferable not to have so exerted himself. So, also, would it have been better if at times he had not been "very active" as his doctor described it, or otherwise exposed himself. But as a justification for a continuous failure to answer, ill-health was a trumped-up, insubstantial excuse. Counsel did not even present medical testimony until my decision after the first hearing made it worth trying. When the Florida and Boston doctors did testify, certain portions of their evidence revealed why they had not been called before. Brody was by no means a man so sick that he must be perpetually immune from unpleasant questioning.

Apart from the medical testimony, without going into detail, the evidence showed him confined to the house, on his own admission, only five-eighths of the time; driving a car himself; conducting as early as January, 1956, daily conferences with his counsel about his tax matters, and, throughout the year, having other conferences of a non-social nature. I observed him at the hearing, and while he testified slowly at times, he appeared both intelligent and alert. Nor was I impressed by the contention that if he had answered the questions the government would have levied on his assets, and that in this posture he was to be compared with Silas Marner, whose money, when stolen from him, had been all he had in the world. The differences between Marner's situation and Brody's are more striking than the similarities. If I were to compare him with anyone it would be with another Brodie,—Steve —who decided to take a chance. I find that he simply took a calculated risk that something would prevent, or that his health would be impaired sufficiently to dissuade, the court from punishing him in a manner worse than the anticipated consequences of obeying the order in the first place.

Brody returned to Boston the first of May, 1956. Neither then, nor at any other time, did he in any way comply with the court order. After the government filed the petition for criminal contempt on June 11 he conferred with Mr. Gottlieb about what should be pleaded, and an answer was filed, which had his approval, stating that he had had another heart attack, that he had been constantly endeavoring to settle his Tax Court case, and that his "attitude towards this court has never been contemptuous. He attempted merely, in his difficult situation, to improve his position for negotiating a settlement of the claimed tax liability." Significantly this answer did not include among his listed reasons for not obeying the order any mention of the fact that he feared that to answer might incriminate him. I find that this was not his reason, or even one

of them. The reason was succinctly stated in the part of the answer just quoted.

On June 28 Brody was examined by a court-appointed physician, who reported that he should not be required to come to court for several months because of a recent heart attack. On July 12 the court adopted that recommendation, but issued a further order, that Brody furnish to the Collection Officer: (1) A description of every expenditure in excess of $500 since November 4, 1955; (2) a statement of all of his assets, by whomsoever held, and of the assets of the Charles Trust. This order recited that it was not intended to revoke the order of January 10. It, too, has not been complied with. On July 16 Mr. Gottlieb informed the Collection Officer in writing that Brody did not intend to comply with the order of July 12 because his answers might tend to incriminate him. This is the first date that any question of self-incrimination was brought to the attention of either the Collection Officer, the government, or the court.

The government argues that July 16 was too late to claim the Fifth Amendment, and that it was not a defense in any event. The Amendment did not affect the Collection Officer's or the court's jurisdiction to pose questions. United States v. Benjamin, 2 Cir., 120 F.2d 521; Jarecki v. Whetstone, D.C. N.D.Ill., 82 F.Supp. 367. At most it afforded an opportunity to assert a privilege against incrimination as to questions which the court could infer, under all of the circumstances, involved something more than an imaginary possibility of incrimination. Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L. Ed. 1118. I have difficulty in perceiving such. Counsel's only suggestion is that disclosure indicating an ability to pay the jeopardy assessment—admittedly not paid—might furnish one element of a wilful intent to evade payment of tax, under either 26 U.S.C.A. (I.R.C.1954) § 7201 or § 7203. United States v. Bardin, 7 Cir., 224 F.2d 255, certiorari denied 350 U.S. 883, 76 S.Ct. 134. There

has been no suggestion that Brody has earned any money for many years, or that he has been able to. Possession of funds, and non-payment, can reasonably relate only to the 1942–1946 taxes presently before the Tax Court. Any wilful nonpayment of these taxes would seem long barred by the statute of limitations. 26 U.S.C.A. (I.R.C.1954) §§ 6531, 6513. I doubt that the subsequent jeopardy assessment therefor can revive the crime, or extend the statute. In any event it is to be questioned how the admission of funds in answer to the court's order could add any necessary element of crimination beyond what was admitted in the answer filed in court on January 28. In it was fully acknowledged, with Brody's express authorization, free possession of at least $230,000 in November, 1955, which would seem quite enough. Cf. Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344. But cf. United States v. Costello, 2 Cir., 198 F. 2d 200, certiorari denied 344 U.S. 874, 73 S.Ct. 166, 97 L.Ed. 677.

Even if the Fifth Amendment were to be considered, any privilege Brody may have had must in fact have motivated him as a reasonable apprehension, Hoffman v. United States, supra, and must have been promptly asserted. United States v. Murdock, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210; United States ex rel. Vajtauer v. Commissioner of Immigration, 273 U.S. 103, 47 S.Ct. 302, 71 L.Ed. 560. He was anything but prompt. By July 16, when he first claimed the privilege, the following events had occurred. December 29, 1955, first petition filed. January 10, 1956, hearing; first order issued. January 19, hearing. January 28, answer filed. January 31, hearing. February 23, hearing. During this period there were two medical examinations conducted in Florida. June 11, second petition filed. June 21, answer filed. June 28, medical examination in Boston. July 6, hearing, argument of question of jurisdiction of court to make the order of January 10. July 12, opinion sustaining jurisdiction filed. July 12, second order entered. July 16, Mr. Gottlieb notifies Collection Officer Brody claims self-incrimination.

By July 16 the court had already accepted the medical report, giving Brody several more months leeway. Nothing was now to be lost by talking about incrimination. In the winter his principal argument on health was only that it would be bad for him to be brought back into the cold weather. Now he was just out of the hospital following a demonstrable heart attack, secure in a long-term medical opinion, and safe from a capias. I find that prior to this his reason for not having replied to the order of January 10 was simply the one set forth in his answer of June 21, "merely, in his difficult situation, to improve his position for negotiating a settlement of the claimed tax liability." Throughout the year he had been negotiating. His counsel stated that he first made an offer of $300,000, which he later increased to $425,000. Less than half of this amount, however, was to be paid forthwith; the rest over a period of time. The government's handicap in not being able to make the inquiry implemented by the court's order is self-evident. I find that maintaining this handicap was his sole purpose; that his disregard of the January 10 order was substantial and flagrant, deliberately and contemptuously persisted in; that there was no physical inability; that no aspect of possible self-incrimination was genuinely apprehended, and that it was affirmatively decided to forgo the claim. A refusal to obey the court "merely" in the hope of impeding the government in its efforts to obtain a proper settlement of his tax liability—a civil matter even though fraud penalties were involved, Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L.Ed. 917,—is improper beyond discussion. The defendant is adjudged in contempt for failure to make response to that order. I do not find it necessary to pass on the second order, and do not, since in many ways it was but a repetition of the first.