Samuel C. BRODY, Respondent, Appellant,

v.

UNITED STATES of America, Petitioner, Appellee.

No. 5207.

United States Court of Appeals First Circuit.

April 26, 1957.

Writ of Certiorari Denied June 17, 1957.
See 77 S.Ct. 1384.

James D. St. Clair, Boston, Mass., with whom Hale & Dorr, Boston, Mass., was on brief, for appellant.

Andrew A. Caffrey, Asst. U. S. Atty., Boston, Mass., with whom Anthony Ju-lian, U. S. Atty., and George H. Lewald, Asst. U. S. Atty., Boston, Mass., were on brief, for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

This is an appeal by Samuel C. Brody from a judgment of the United States District Court for the District of Massachusetts finding him guilty of a criminal contempt under the provisions of 18 U.S.C. § 401.[1] The contempt consisted of a failure to obey an order entered by Judge Aldrich on January 10, 1956, in a civil action captioned John J. Duffy, Acting Group Supervisor, Internal Revenue Service v. Samuel C. Brody. This order in substance required Brody to submit to a collection officer of the Internal Revenue Service under oath and in writing answers to questions relating to the disposition and location of certain of his assets. Though Brody had ample opportunity to comply with this court order, it is clear that he willfully and deliberately refrained from doing so. An asserted excuse, based upon the privilege of self-incrimination, will be dealt with later in this opinion. Despite the earnestness of the presentation by counsel for appellant, we are satisfied that this is a clear case requiring affirmance of the judgment under review.

The events leading up to Brody's conviction began on November 4, 1955, when the Internal Revenue Service entered a jeopardy assessment against him for unpaid income taxes for the years 1942–1946 in the amount of $663,629.31 and demanded payment. 26 U.S.C. § 6331(a). Commencing a few days after receipt of this demand, Brody proceeded to liquidate a substantial block of securities from which he realized in cash, as of November 29, 1955, the sum of $330,000.00.

1. 18 U.S.C. "§ 401. Power of court.
   A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority and none other, as—* * *
   "(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."

On December 6, 1955, the Internal Revenue Service served a summons upon Brody, stated to have been issued under authority of § 7602 of the Internal Revenue Code of 1954, which directed him to report on December 16, 1955, at the office of Myles P. McCabe, an officer of the Internal Revenue Service in Boston, Massachusetts, to give testimony relating to his tax liability. Section 7602, together with other relevant sections of the Internal Revenue Code of 1954, is copied in the footnote.[2]

On December 7 or 8, 1955, Brody told his counsel, Arthur Gottlieb, Esq., that he would not appear at the revenue

2. "§ 7210. Failure to obey summons.

"Any person who, being duly summoned to appear to testify, or to appear and produce books, accounts, records, memoranda, or other papers, as required under sections 7602, 7603, and 7604(b), neglects to appear or to produce such books, accounts, records, memoranda, or other papers, shall, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both, together with costs of prosecution."

"§ 7402. Jurisdiction of district courts.

"(a) To issue orders, processes, and judgments.—The district courts of the United States at the instance of the United States shall have such jurisdiction to make and issue in civil actions, writs and orders of injunction, and of *ne exeat republica*, orders appointing receivers, and such other orders and processes, and to render such judgments and decrees as may be necessary or appropriate for the enforcement of the internal revenue laws. The remedies hereby provided are in addition to and not exclusive of any and all other remedies of the United States in such courts or otherwise to enforce such laws.

"(b) To enforce summons.—If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, or other data, the district court of the United States for the district in which such person resides or may be found shall have jurisdiction by appropriate process to compel such attendance, testimony, or production of books, papers, or other data."

"§ 7601. Canvass of district for taxable persons and objects.

"(a) General rule.—The Secretary or his delegate shall, to the extent he deems it practicable, cause officers or employees of the Treasury Department to proceed, from time to time, through each internal revenue district and inquire after and concerning all persons therein who may be liable to pay any internal revenue tax, and all persons owning or having the care and management of any objects with respect to which any tax is imposed."

"§ 7602. Examination of books and witnesses.

"For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized—

"(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

"(2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and

"(3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry."

"§ 7603. Service of summons.

"A summons issued under section 7602 shall be served by the Secretary or his delegate, by an attested copy delivered in hand to the person to whom it is directed, or left at his last and usual place of abode; and the certificate of service signed by the person serving the summons shall be evidence of the facts it states on the hearing of an application for the enforcement of the summons. When the summons requires the production of books, papers, records, or other data, it shall be sufficient if such books, papers, records, or other data are described with reasonable certainty."

"§ 7604. Enforcement of summons.

"(a) Jurisdiction of district court.— If any person is summoned under the internal revenue laws to appear, to testify, or to produce books, papers, records, or other data, the United States district court for the district in which such person resides or is found shall have jurisdic-

office in response to this summons. On December 8 Mr. Gottlieb requested that the hearing be advanced from December 16 to December 14 but did not state a reason for such request.

Mr. Gottlieb appeared on December 14, 1955, at the revenue office and stated that Brody had told him that he was physically unable to be present and also that he probably would not be able to appear for at least a year. The revenue officer requested Mr. Gottlieb to inquire of Brody whether the hearing could not be held on that very afternoon. Later in the day Mr. Gottlieb reported back that Brody had been advised by his doctor not to appear. On the next day, December 15, 1955, Brody left for Florida by airplane without leave of the revenue office and without notice.

As a result of Brody's failure to respond to the summons, a civil action was commenced against him in the United States District Court for the District of Massachusetts on December 29, 1955, by petitioner John J. Duffy, Acting Group Supervisor, Delinquent Accounts and Returns Branch, Internal Revenue Service. The petition recited that it was brought under the provisions of § 7604 of the Internal Revenue Code of 1954. The petitioner asked the court to issue an order to Brody to show cause why his person should not be attached "as for contempt" and to show cause why he should not be ordered to appear on a day fixed by the court before the Internal Revenue Service and testify as directed by the summons. The petition concluded, in the usual form, with a request for "such other order or relief as this Court may deem just and proper." Though this petition is entitled "Petition for Attachment as for Contempt" and though a similar phrase is contained in § 7604(b), the proceeding was not strictly one of contempt, but was more accurately a proceeding to obtain the assistance of the court in forcing Brody to give the desired information to the Internal Revenue Service by the device of having the court issue an order to that effect, disobedience of which would be a contempt punishable by the court. It is true that § 7210 of the Internal Revenue Code makes it a crime for a person who being duly summoned to testify as required by § 7602, neglects to do so. But presumably a conviction of this offense could only be had upon a regular criminal prosecution, with the right of trial by jury. Brody could not have been punished summarily by the court for a contempt of court for his failure to obey the summons of the Internal Revenue Service.

Upon consideration of the foregoing petition by John J. Duffy, the district court entered an order on December 29, 1955, directing Brody to appear before it on January 9, 1956, "and then and there show cause, if any, as to why his person should not be attached as for contempt." Brody did not personally appear in court as directed by this order to show cause; at the hearing Mr. Gottlieb appeared in opposition to the entry of an order for attachment and asserted that Brody was physically disabled. As Mr. Gottlieb did not have specific au-

tion by appropriate process to compel such attendance, testimony, or production of books, papers, records, or other data.

"(b) Enforcement.—Whenever any person summoned under section 7602 neglects or refuses to obey such summons, or to produce books, papers, records, or other data, or to give testimony, as required, the Secretary or his delegate may apply to the judge of the district court or to a United States commissioner for the district within which the person so summoned resides or is found for an attachment against him as for a contempt. It shall be the duty of the judge or commissioner to hear the application, and, if satisfactory proof is made, to issue an attachment, directed to some proper officer, for the arrest of such person, and upon his being brought before him to proceed to a hearing of the case; and upon such hearing the judge or the United States commissioner shall have power to make such order as he shall deem proper, not inconsistent with the law for the punishment of contempts, to enforce obedience to the requirements of the summons and to punish such person for his default or disobedience." 26 U.S. C.A. §§ 7210, 7402, 7601–7604.

thority to represent Brody, the matter was continued to the following day, January 10, 1956, at which time Mr. Gottlieb informed the court that he had spoken with Brody and was authorized by him to enter a general appearance, which he did.

Government counsel submitted a draft of a proposed order whereby Brody would be required to state under oath, and in writing, answers to certain questions respecting the disposition of the funds realized from the recently liquidated securities, and other financial information. It was proposed by counsel for the government that Brody prepare his answers in Florida and send them to the collection officer in Massachusetts. Mr. Gottlieb expressed his opinion that this was a "reasonable request under the circumstances." After a further colloquy the court said: "In view of the rather extraordinary circumstances of the defendant not being here before the Court, that we have adverted to in the past, I will enter such an order". Mr. Gottlieb put his initials upon the order as indicating his approval. The court entered the order so drawn on January 10, 1956. This order, the disobedience of which was the basis of the finding of criminal contempt herein, is summarized in the footnote.[3]

Brody at no time obeyed the order of January 10, 1956, of which he had full personal knowledge within at least seven days of its issuance. Mr. Gottlieb represented to the court that Brody was physically unable to answer, and several hearings were held with respect to his physical condition. On January 19, 1956, an oral application was made for a bench warrant to compel Brody's personal presence. The court did not pass on this motion for lack of medical evidence from which the true state of Brody's condition might be determined.

Against the background of this claimed disability, the record shows that when the request was made to advance the hearing from December 16 to December 14, 1955, neither Mr. Gottlieb nor Brody advised the revenue officials that Brody had an airplane reservation to Miami for December 15, 1955, and that he had made such reservation well before that date. Nor were the officials informed of this on December 14 when Mr. Gottlieb reported appellant's ill health. The record further shows that Brody did not see his regular physician, Dr. Kramer, until the *afternoon* of December 14; the meeting was not at Brody's home but at Dr. Kramer's office, and the doctor did not "know what prompted this visit." Apparently it was short. "He came in, said hello, good-bye * * *." It seems he did not go to Dr. Kramer for treatment and none was given.

After Brody's arrival in Miami he suffered a heart spasm at his hotel which kept him in bed for several days. His Miami physician attributed this attack

---

3. By the order of January 10, 1956, the court ordered Brody to submit to Collection Officer Myles P. McCabe, Internal Revenue Service, 174 Ipswich Street, Boston, Massachusetts,

"within seven days after entry of this Order a written statement under oath of the following:

"(1) The date, amount and nature of each and every expenditure by him in excess of $500 since November 4, 1955."

(2) The disposition of the proceeds of certain described checks drawn by H. C. Wainwright & Co. and endorsed and cashed by Brody, and the present location of any property acquired with such proceeds.

"(3) If the proceeds of the aforementioned checks have not been disposed of. a statement of the present whereabouts of such proceeds.

"(4) A full and complete statement of all assets whether held by the respondent or held by others for him or held by him for the Charles Trust, so-called, of every kind and nature, their present location, and their present value.

"It is further ordered that commencing with the seventh day after entry of this Order and until further notice, at the end of every seven-day period the respondent shall submit to the said Collection Officer Myles P. McCabe a written statement under oath of the amount of his expenditures during such seven-day period and of any changes in form, amount or location of the assets enumerated in the sworn statement required by this Order to be submitted."

to the strain of travel. Following this spasm Brody was not hospitalized but continued to live at his hotel and made visits to the doctor at his office in the same hotel about once a week.

Brody returned to Boston by airplane in April, 1956, but he never made any move to comply with the court's order of January 10. As a result, on June 11, 1956, the United States Attorney, on behalf of the United States, filed a petition against Brody for attachment for criminal contempt under 18 U.S.C. § 401. Upon consideration of this petition, on the same day, the district court entered an order directing Brody to file his answer to the petition in writing and to appear personally before the district court on June 22, 1956, "and then and there show cause, if any, as to why he should not be adjudged in criminal contempt."

On June 21, 1956, an answer was filed in Brody's behalf by Mr. Gottlieb which in substance admitted the factual allegations of the criminal complaint but asserted that the court was without jurisdiction or authority to enter its order of January 10, 1956. Further, the answer stated: "The Respondent's attitude toward this Court has never been contemptuous. He attempted merely, in his difficult situation, to improve his position for negotiating a settlement of the claimed tax liability." Nothing was said in the answer about any privilege against self-incrimination. There was an additional statement in the answer that Brody was confined to the hospital as a result of another heart attack suffered by him on June 14, 1956, and therefore that he could not personally appear before the court on June 22, as ordered. When Brody did not appear in court on that day, the court appointed a physician to make a medical examination of him, and this physician's report was filed July 5, 1956.

Thereafter, on July 12, 1956, the court entered a further order directing in substance that appellant through his attorney submit the information required by the January 10 order to the collection officer. Brody did not obey this order, and through his attorney advised the collection officer that he refused to respond to the order on the ground that his answers might tend to incriminate him. This is the first time that reliance on the Fifth Amendment by Brody was brought to the attention of any representative of the United States or to the attention of the court.

On August 27, 1956, Brody filed a motion that the petition for criminal contempt be dismissed on the ground that the district court lacked jurisdiction to enter its order dated January 10, 1956. This motion was denied by the court in an opinion filed September 19, 1956. 144 F.Supp. 749. On November 15, 1956, the government filed a motion for a new physical examination, and the examining physician reported on November 23 that Brody was able to stand trial. The trial on the charge of criminal contempt was held on December 11, 1956, Brody then being personally present in court.

An opinion concluding that Brody was guilty of criminal contempt was handed down on the morning of December 27, 1956. The question of sentence was argued in the afternoon of the same day, at which hearing Mr. Gottlieb referred to the fact that the court's opinion had commented on the failure of Brody's attorneys, Messrs. Gottlieb and Murray, to corroborate Brody's testimony regarding the Fifth Amendment, and stated: "both Mr. Murray and myself were asked by Mr. Brody, as late as the latter part of January anyway, to plead the Fifth Amendment for him". At the court's suggestion a motion to reopen the proceeding for criminal contempt was made, and the court entered an order reopening the proceedings for all purposes, including the taking of any proper evidence any party wished to offer on the question whether response to the order of the court might have involved incrimination. After a further hearing on January 4 and 7, 1957, the district court filed an opinion on January 11 concluding again that

the defendant was guilty of criminal contempt. 147 F.Supp. 897. A formal judgment was entered on the same day adjudging the defendant in criminal contempt for failure to respond to the court's order of January 10, 1956, and sentencing the defendant to a term of imprisonment for one year. The present appeal was taken from this judgment of conviction.

Appellant advances several grounds for reversal of the judgment of the district court. The first ground goes to the jurisdiction of the district court and thus challenges the lawfulness of the order of January 10, 1956. It is maintained that when a taxpayer fails to comply with a summons of the Internal Revenue Service issued under 26 U.S.C. § 7602, the district court can proceed only in strict accordance with the enforcement provisions of 26 U.S.C. § 7604(b). Accordingly it is said that, as a condition precedent to the power of the district court to enter any enforcement order under that section, it is necessary for the court to issue an attachment for the arrest of the taxpayer so as to bring him personally into the court. We find no such condition precedent in the terms of § 7604(b), which states it to be "the duty" of the judge to hear the application for enforcement filed by the Revenue Service and, "if satisfactory proof is made," to issue an attachment for the arrest of the taxpayer. But the section does not imply that the court is powerless to proceed to a hearing of the case when the taxpayer, being duly notified, pleads ill health as an excuse for failure personally to attend the hearing, and causes the entry of a general appearance on his behalf by his chosen counsel. This is certainly an effective waiver of any right which the taxpayer might have had to be personally present at the hearing of the petition.

Furthermore it is contended that the district court is limited by § 7604(b) to the issuance of an enforcement order merely requiring compliance with the precise terms of the original summons issued by the Internal Revenue Service under § 7602 which the petition charged the taxpayer with ignoring; instead of which, so the argument runs, the district court improperly issued an order broader in scope than the original summons, calling, for example, for continuing performance by the taxpayer in the submission of weekly statements of his expenditures "until further notice". The propriety of the court's order of January 10, 1956, in modifying and enlarging the terms of the original summons issued under § 7602, seems to raise an issue of first impression, but we have little difficulty in concluding that the court's order was lawful in this respect.

In the first place we do not read § 7604(b) as narrowly as appellant asks us to do. The power of the enforcing court is stated in broad terms as a power "to make such order as he shall deem proper" to enforce obedience to the requirements of the summons. In the situation presented to the district court in this case, we do not think the court should be powerless to promulgate an order, on request of the Revenue Service, embodying a reasonable modification of the original summons. No doubt the demand upon Brody in the order of January 10 was a reasonable one, as even his own lawyer conceded at the time. The court clearly had power to request periodical reports from the taxpayer, and the information called for was certainly "essential to any thorough tax investigation". See United States v. United Distillers Products Corp., 2 Cir., 1946, 156 F.2d 872, 874. In addition to the support which § 7604(b) gives to the order of January 10, the general grant of jurisdiction contained in § 7402 of the Code independently supplies ample authority for the order. (Section 7402 is set forth supra in note 2.) It would be difficult to find language more clearly manifesting a congressional intention to provide the district courts with a full arsenal of powers to compel compliance with the internal revenue laws. That the Rev-

enue Service never purported to act under § 7402 in issuing its original summons to the taxpayer or in filing its petition with the district court is entirely irrelevant to the district court's jurisdiction. United States v. United Mine Workers, 1947, 330 U.S. 258, 302, 67 S.Ct. 677, 91 L.Ed. 884; see also United States v. Weisenbloom, 2 Cir., 1948, 168 F.2d 698.

■ The other points urged as grounds for reversal boil down to the proposition that Brody was justified in not responding to the questions contained in the order of January 10, first, because of the condition of his health, and, second, because of the Fifth Amendment.

In dealing with the first of these alleged justifications, the district court distinguished sharply between Brody's physical ability to appear in court and his physical ability to consult with his advisors and to formulate his answers in writing to the inquiries contained in the order. Appellant's health was certainly not too good, and the district court specifically reserved the question whether or not Brody could have appeared in court earlier than he did, although the findings disclose severe doubts about Brody's sincerity in this respect.[4] But the court did state that it was "satisfied beyond a reasonable doubt" that at least for extensive periods Brody could have obeyed the order to submit to the Revenue Service written answers to the questions propounded, and could have done so without danger to his health. Upon an examination of the entire record, we are not disposed to disagree with this basic finding. Indeed a contrary ruling would be in disregard of the clear import of the evidence, which was without contradiction, that, during the period when Brody was supposed to have been physically incapacitated in Florida, he was confined to the house only a little more than half of the time; was driving a car himself; was conducting daily conferences with his counsel about tax matters as early as January, 1956, and throughout the year engaging in other conferences. In short, the record furnishes ample grounds for the finding of the district court that appellant was not in such poor state of health as to render him incapable of responding to the command of the court.

■■ The Fifth Amendment excuse remains to be considered.

At the outset it is to be noted that Brody was not convicted of contempt in the presence of the court. The order of January 10 required him to do something away from the court, that is, to supply certain information to the Internal Revenue Service. The contempt, if there was one, must have taken place shortly after Brody received notice of the January 10 order and, having an opportunity to do so, chose not to comply with it. When Brody came to trial upon the charge of criminal contempt

---

4. The district court's views on this issue are as follows:

"This hearing is not for contempt for failure to respect that original summons. There is no question but that respondent's health was not good, and as a result of medical opinion, following examination, I did not order him to appear. I do not pass on whether physically he could, or could not, have appeared in court earlier than he did, and the present proceeding relates solely to his failure to obey the orders which I issued in lieu of compelling his earlier attendance in person. I might add, however, that the evidence introduced by Brody on January 4 left me with the strong impression that his failure to respond originally to the Collec-

tor's summons not only was not medically justifiable, but was not genuinely believed by him to be. He did not even seek express medical opinion to that effect from his regular physician. Instead, he simply made the doctor a visit, perhaps so that there would be a record, and then instructed counsel to say the doctor told him not to attend. When the Collection Officer, temporarily, took counsel's medically unsupported statement, Brody left, unannounced to the Officer, for Florida, from which distance he could more readily claim his health would not permit him to appear when his attendance was again sought." (Note 2 to Judge Aldrich's opinion, not included in 147 F.Supp.)

on December 11, 1956, the issue to be decided was whether Brody had already irretrievably committed a contempt of court by disobedience of the court's order of January 10 at some time on or before the date on which the United States Attorney had filed his petition for attachment for criminal contempt.

Some light may be thrown upon the case at bar by consideration of the situation which was presented in Carlson v. United States, 1 Cir., 1954, 209 F.2d 209. There, Carlson had refused to answer certain questions before the grand jury on the ground of the Fifth Amendment privilege. That was not an independent crime, nor was it a contempt of court under 18 U.S.C. § 401, even if the privilege had been erroneously invoked. The grand jury thereafter filed a "presentment" against Carlson, in which the assistance of the court was asked in order to compel him to answer. Before ordering Carlson to go back to the grand jury and answer the questions, the court had necessarily to rule, after a full hearing, on the availability of the privilege against self-incrimination as asserted by Carlson. If the court after a hearing had ruled against the privilege and had ordered Carlson back to the grand jury, with direction to answer the questions, then Carlson would have had a choice to make: (1) He might have elected to obey the court order, or (2) he might have elected to disobey the court order, thus inviting a risk of being found in criminal contempt. He would have had to take his chances on being able to convince an appellate court that the district court committed reversible error in ruling that the privilege against self-incrimination was not properly invoked under the circumstances. But if he should have thus succeeded in this court, or ultimately on review by the Supreme Court, then the district court judgment of conviction for criminal contempt would have had to be vacated because of the appellate determination that respondent did not disobey a "lawful" order of the district court within the meaning of 18 U.S.C.

§ 401(3). Hoffman v. United States, 1951, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118; Maffie v. United States, 1 Cir., 1954, 209 F.2d 225, 226. But it seems pretty clear that, if Carlson had made an unexplained refusal to answer the questions put to him in the grand jury room, and had not asserted a privilege against self-incrimination in the ensuing presentment proceeding before the district court, that would have constituted a waiver of the privilege. The court was under no duty to raise the question of privilege *sua sponte;* the privilege must be affirmatively claimed by the witness. United States v. Murdock, 1931, 284 U.S. 141, 52 S.Ct. 63, 76 L.Ed. 210. And if the court in the presentment proceeding, having no issue before it respecting the privilege, directs the respondent to go back to the grand jury and give answer to specified relevant questions, it would seem that respondent would be in criminal contempt for refusal to obey such court order; and upon a hearing on an order to show cause why he should not be adjudged in criminal contempt, it would be too late to plead the privilege as a defense.

The situation presented in the case now before us is not dissimilar to that found in the Carlson case. Here, Brody's failure to respond to the summons issued by the Internal Revenue Service under § 7602 may have been independently criminal, under 26 U.S.C. § 7210, but it was not a contempt in the presence of the court within the meaning of 18 U.S.C. § 401(1). The court petition filed by the Internal Revenue Service under 26 U.S.C. § 7604(b) was like the presentment filed by the grand jury in the Carlson case. It was an application to the court for assistance in the current tax investigation by means of a court order directing Brody to furnish information to the Internal Revenue Service. Brody filed an answer to that petition under § 7604(b), but in such answer he asserted no privilege against self-incrimination; nor indeed had he ever asserted before the Internal Revenue Service that he had disregarded its

summons because the disclosures called for would have violated his privilege against self-incrimination.

It is true that Brody was not personally present at the hearing on the petition of the Internal Revenue Service under § 7604(b). But of course he was subject to the jurisdiction of the court by virtue of having directed his attorney to enter a general appearance on his behalf. And when the court had before it the question whether to issue the order drafted and proposed by the Internal Revenue Service, Brody's attorney certainly could have objected that an order in the proposed terms would violate Brody's privilege against self-incrimination.[5] Instead of that, counsel for Brody conceded at the time that the terms of the proposed order were reasonable.

There being no issue of self-incrimination before the court at the time, the court proceeded to issue its order of January 10, 1956, in the terms requested by the Internal Revenue Service. It may well be that, after the court issued its order of January 10, it was too late for Brody to assert a privilege against self-incrimination, at least on grounds in existence on the date of the court's order. If this is so, then affirmance of the judgment of conviction for criminal contempt is inescapable. The analogy to the situation in the Carlson case is certainly striking. It is only by a latitudinarian though now well-established interpretation of the words of the Fifth Amendment, "nor shall [any person] be compelled in any criminal case to be a witness against himself," that the privilege might have been available at all to Brody in the case at bar. This is not a situation where he was being compelled to testify against himself in a criminal case, nor even where disclosures exacted of him elsewhere were sought to be presented as evidence against him in a criminal case.

However, in the absence of precedents squarely in point, we prefer not to rest our affirmance on the foregoing ground. We shall assume, in Brody's favor, that Brody, or his attorney, could sit tight while the court was framing its enforcement order under § 7604(b) without suggesting a possible question as to the privilege against self-incrimination, and then assert the privilege at a later point as an excuse for noncompliance with the court's order.

Making that assumption, when and how would Brody have to assert his privilege against self-incrimination as an excuse for not answering the questions propounded in the court's order? It might be a salutary rule if respondent were required to declare his claim of privilege fairly early after his determination not to respond to the questions, by some form of communication, either to the Internal Revenue Service or to the court, stating that he must decline to furnish the information requested by the order of January 10 because of a fear of self-incrimination. That would put the government on notice of respondent's claimed reason for noncompliance, and

---

5. There appears to be some confusion concerning the power of a duly authorized attorney to claim the privilege against self-incrimination on behalf of his client in view of statements in two cases in other circuits that, because the privilege is a personal one, it cannot be asserted by a third party, not even by an attorney. See Ziegler v. United States, 9 Cir., 1949, 174 F.2d 439, 447; United States v. Johnson, D.C.Pa.1947, 76 F.Supp. 538, 540. But the authorities cited in these two cases are clearly distinguishable. They either held or said merely that, when a witness is asked to respond to a lawful question, he cannot refuse to answer by setting up "the privilege of another person or of a corporation as an excuse for a refusal to answer; in other words, the privilege is that of the witness himself, and not that of the party on trial." McAlister v. Henkel, 1906, 201 U.S. 90, 91, 26 S.Ct. 385, 50 L.Ed. 671. See also Hale v. Henkel, 1906, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652; London v. Everett H. Dunbar Corp., 1 Cir., 1910, 179 F. 506; In re Knickerbocker Steamboat Co., D.C.S.D.N.Y.1905, 136 F. 956. This is quite different from a holding that a properly authorized agent of an individual, including his attorney, is powerless to assert the privilege for his principal in appropriate circumstances. The Supreme Court has never so held, nor have we.

would afford the United States Attorney an opportunity to give consideration to this asserted defense before instituting a proceeding for criminal contempt.

Again, however, we make an assumption in Brody's favor, that he could simply ignore the court's order of January 10, and do nothing else, and assert his Fifth Amendment defense if and when he might be haled into court on a charge of criminal contempt.

If the foregoing is so, then surely the proper time to have claimed the defense of privilege was when Brody filed his answer on June 21, 1956, to the court's order to show cause why he should not be adjudged in criminal contempt. But, as we have seen, his answer made no allusion to the Fifth Amendment, and merely explained that he had not meant to be contemptuous of the court, that he was simply denying to the Internal Revenue Service the requested information so as to be in a better bargaining position to negotiate a compromise of his tax liabilities. The pleadings having raised no issue of privilege, the district court would have been justified in adjudging Brody guilty of contempt without reference to that excuse. But the court declined to be technical about the matter and, after having first adjudged Brody guilty, it entered an order reopening the contempt proceeding for the purpose of allowing the presentation of evidence on the issue of self-incrimination. Since the district court thus considered the issue of self-incrimination, we may take it, in the present posture of the case, as though the district court had informally permitted an amendment of Brody's answer to the show cause order, and as though Brody had set up the defense of privilege in an amended answer.

But if, as we have assumed, it was not too late to raise an issue of the Fifth Amendment in the proceeding for criminal contempt, just what, more precisely, was the content of such issue which Brody properly could raise at that point? Supposing, as we have, that Brody need not have claimed his privilege in the civil enforcement proceeding under § 7604(b), and that he need not have claimed his privilege by some form of communication either to the Internal Revenue Service or to the court promptly after deciding not to obey the court order of January 10, then the very least Brody would have had to show, at the trial on a charge of criminal contempt, was that he had failed to obey the court order of January 10 *because of* the Fifth Amendment privilege; that is, because of a genuine apprehension that true answers to the questions propounded to him might involve him in self-incrimination.

On this narrowed issue, the district court's adverse findings are supported by overwhelming evidence. It seems to be a fact that, shortly after the issuance of the order of January 10, Brody stated to his counsel, in Florida, that he did not want to comply with it, and in the ensuing discussions it seems that they gave some consideration to a possible claim under the Fifth Amendment. However, the district court found that Brody reached the affirmative decision not to assert a privilege against self-incrimination, as a matter of tactics, "for substantive, not for procedural reasons." [147 F.Supp. 899] The court found that Brody's disregard of the January 10 order "was substantial and flagrant, deliberately and contemptuously persisted in; that there was no physical inability; that no aspect of possible self-incrimination was genuinely apprehended, and that it was affirmatively decided to forgo the claim." The court found that Brody's real reason for disobedience of the order was as stated in his answer to the order to show cause why he should not be adjudged in contempt: "He attempted merely, in his difficult situation, to improve his position for negotiating a settlement of the claimed tax liability." In corroboration of these findings, which were amply supported by the evidence, the district court pointed out: "In conformity with this I-have-nothing-to-hide policy he authorized Mr. Gottlieb to admit in the answer filed January 28, 1956 to the Duffy petition [the enforcement petition filed by the Internal Revenue

Service pursuant to § 7604(b)] the very facts which he now claims it would incriminate him to elaborate upon."

A judgment will be entered affirming the judgment of the District Court.