**Application of J. M. HOUSE to Enforce Obedience to the Requirements of Summons Served upon Czar Smith Winters.**

**Misc. No. 421.**

United States District Court
N. D. California, S. D.
July 11, 1956.

Robert Schnacke, Asst. U. S. Atty., San Francisco, Cal., for the Government.

Melvin, Faulkner, Sheehan & Wiseman, San Francisco, Cal., for taxpayers.

EDWARD P. MURPHY, District Judge.

This is a proceeding under 26 U.S.C. § 7604 to enforce a subpoena requiring the production of certain documents for examination by the Bureau of Internal Revenue pursuant to 26 U.S.C. § 7602.[1]

Irving S. Levy, Harry C. Levy, Barney B. Levy, and Helen Levy are the taxpayers in question. Taxpayers are partners in a clothing business. In 1953, the government began an investigation to determine whether there was a basis for an indictment of taxpayers on the criminal charge of tax evasion. Having learned of the investigation, taxpayers retained counsel, including Winters. Taxpayers have since 1945 employed, and continue to employ, an accountant named Wood in

1. "For the purpose of ascertaining the correctness of any return, making a return where none has been made, determining the liability of any person for any internal revenue tax or the liability at law or in equity of any transferee or fiduciary of any person in respect of any internal revenue tax, or collecting any such liability, the Secretary or his delegate is authorized—

"(1) To examine any books, papers, records, or other data which may be relevant or material to such inquiry;

"(2) To summon the person liable for tax or required to perform the act, or any officer or employee of such person, or any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax or required to perform the act, or any other person the Secretary or his delegate may deem proper, to appear before the Secretary or his delegate at a time and place named in the summons and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry; and

"(3) To take such testimony of the person concerned, under oath, as may be relevant or material to such inquiry. Aug. 16, 1954, 9:45 a. m., E.D.T., c. 736, 68A Stat. 901."

a variety of accounting capacities relating to the business and personal accounts of the partnership and the partners. In the course of such employment, Wood had received from the taxpayers a large quantity of files, records and other documents, which he retained in his offices. In the course of such employment, Wood has also prepared a number of "working papers", consisting of abstracts, analyses, and other extracts or compilations relating to the documents given him from time to time by the taxpayers.

Upon advice of counsel, taxpayers instructed Wood to turn over all documents, specifically including his working papers, relating to taxpayers, to taxpayers and their counsel. Taxpayers instructed their accountant to turn over certain files to themselves directly, and other files, including the working papers, to their counsel on their behalf. Wood did as he was instructed. He testified that he realized that he retained no further interest in the documents he turned over to taxpayers and their counsel, and that he could not get them back. From time to time after turning these documents over to taxpayers and their counsel in 1953, Wood was given access to them, in connection with work he was doing for taxpayers, but in each case with the permission of counsel for taxpayers.

The subpoena which is sought to be enforced in this proceeding was served on taxpayers' counsel, Winters, Harless and Faulkner, on April 6, 1956.[2] It directed them to produce:

"All documents, records and files relating to the named taxpayers and their parents, received from Kenneth S. Wood, C.P.A., or any agent or employee of Mr. Wood, and particularly the 31 files received from Kenneth S. Wood, C.P.A., San Jose, California, on or about September 3rd or 4th, 1953, consisting of the accountant's work papers and other files relating to accounting work performed by Mr. Wood during the above named and prior period for the named taxpayers and their parents."

Winters and his associates appeared at the time and place named in the subpoena with all the papers in question, but they declined to turn over any of the papers, on three separate grounds:

1) That the statute of limitations on the collection of taxes with respect to the period to which some of these papers related had run, and that papers relating to such periods could therefore not be examined;

2) That the papers were entrusted to them within the attorney-client relationship, and they were therefore protected from disclosure under the attorney-client privilege of the law of evidence;

3) That they were invoking, on behalf of their clients, the privilege against self-incrimination guaranteed by the Fifth Amendment to the Constitution of the United States.

This proceeding was thereupon instituted by the government. At the hearing, the government withdrew its request for all documents except the "working papers" of the accountant Wood. Those papers, therefore, are the only ones in question.

 Taxpayers' contentions regarding the attorney-client privilege are so clearly unfounded that it is astonishing to find able counsel raising such arguments in their behalf. Indeed, no argument is made in the brief of taxpayers' counsel, and no cases are cited, to support the application of the attorney-client privilege to these documents. It is entirely clear from the record that the attorneys now making this claim at all times knew that the documents at any time involved were either disclosed to the accountant Wood and his associates, or produced by Wood, *prior*

---

2. An identical subpoena was served upon Wood, who complied to the extent of producing all documents in his possession. 

The subpoena served upon Wood is not in question in this proceeding.

to their delivery to counsel. Under such circumstances, it is obvious that no privilege can subsequently arise.

 Taxpayers' contentions regarding the statute of limitations apparently rest upon 26 U.S.C. § 7605(b), which bars "unnecessary examination and investigations" in pursuance of the power granted to the government under 26 U.S.C. § 7602. This limitation upon the government's investigatory power is one of great importance to the privacy of the papers of taxpayers and potential taxpayers, as well as any person who may have had financial dealings with them. The courts have not as yet had much opportunity to give specific meaning to the general language of 26 U.S.C. § 7605(b). The test of a complaint by the government which would entitle it to examine documents relating to periods earlier than those for which tax liability may be assessed at the time of examination would appear to be whether the complaint alleges with sufficient particularity the likelihood of fraud on the part of the person under investigation, so as to make inapplicable the statute of limitations. See Martin v. Chandis Securities Co., 9 Cir., 1942, 128 F.2d 731, 735. It would appear from the Martin case that where the government seeks to examine documents relating to a period for which tax liability is ordinarily barred by the statute of limitations, the burden is on the government to show why such examination is not "unnecessary". In the case of examinations relating to a "net-worth" case against the taxpayer, government has been allowed to examine documents relating to periods barred by the statute of limitations, apparently to permit the government to "establish a sound starting point". See Falsone v. United States, 5 Cir., 1953, 205 F.2d 734, 743. In the nature of things, a net-worth method of investigation would seem to be coupled with one relating to possible fraud on the part of the taxpayer, so that the establishment of "a sound starting point" is only a part of an investigation relating to fraud, and

not a separate support for a showing that an investigation is not "unnecessary", though delving into periods beyond the ordinary statute of limitations. In the instant case, no allegation of a net-worth examination is made by the government. The complaint alleges that the investigation of taxpayers' possible evasion of income taxes for the years 1950 to 1953, inclusive, was prompted by the discovery of a large sum of cash in a safe deposit box in 1951, and the deposits of cash totaling some $300,000 during the year 1950, all without a "reasonable" explanation to representatives of the Internal Revenue Service. The complaint further states "that in order to determine whether or not taxpayers have attempted to defeat and evade income taxes for years 1950 to 1953, inclusive, it is necessary and desirable that an investigation be made into the original cost of assets held by taxpayers at the beginning of the year 1950, and thereafter; the nature and kind of assets disposed of by taxpayers before 1950, which were, or which might have been, converted into assets which were held at the beginning of the year 1950, or thereafter; the amounts of cash or other assets received by taxpayers, the amounts of borrowings, gifts, bequests, or other non-taxable receipts, and other matters relating to years before and after 1950, which tend, or might tend, to bear upon the assets and liabilities of taxpayers at the beginning of the year 1950, and thereafter, and the nature and amounts of taxpayers' income and expense during the years 1950 to 1953, inclusive."

 These allegations are considerably more detailed than those involved in Martin v. Chandis Securities Co., supra. The government alleges an investigation into attempts to "evade" and "defeat" taxes, which fairly connote fraud. It supports those allegations with a recital of facts which make it reasonable to investigate the possibility of fraud. The statute of limitations for civil actions is therefore no obstacle to the investigation here sought.

Before turning to the disposition of taxpayers' contention of their privilege against self-incrimination under the Fifth Amendment to the Constitution, it becomes necessary to dispose of two other Constitutional contentions raised by taxpayers, through their counsel, at the hearing before the agent of the Internal Revenue Service.

In addition to the grounds of refusal mentioned above, taxpayers, through their counsel, refused to turn over the documents to the Internal Revenue Service on the grounds that the government, in obtaining these documents by subpoena, would be conducting an illegal search and seizure, forbidden by the Fourth Amendment to the Constitution, and would also be denying taxpayers the right to counsel guaranteed them by the Sixth Amendment to the Constitution. The contention under the Fourth Amendment is, for the purposes of this case, subsumed under the right against self-incrimination. If it is not self-incriminatory to require taxpayers to turn over these documents, it is difficult to see why it is an unreasonable search and seizure, provided the statutory procedure is observed. Counsel do not contend otherwise, and apparently treat the objections under the Fifth and Fourth Amendment as one.

The contention under the Sixth Amendment seems to have been made for good measure rather than for good reason. It was not seriously pressed at the hearing before the agent, it was not mentioned at the hearing in this court, and it is not supported by the briefs for taxpayers. Taxpayers have at all times had counsel. The Sixth Amendment bears no relation whatsoever to this case. In this connection, it may perhaps properly be remarked that the majesty of our Constitutional safeguards of liberty is not enhanced by casual and unfounded invocations. The shotgun approach to pleading is out of place when the Constitution is in question.

The substantial question in this case is whether the government is seeking an order for production of documents which would violate the taxpayers' privilege against self-incrimination as guaranteed by the Fifth Amendment to the Constitution.

The government attacks, first, the standing of the attorneys to invoke the privilege on behalf of their clients. In the citation of cases to support its position, the government has been more zealous than accurate. In support of the statement that "this privilege may not be claimed * * * by an attorney on behalf of his client", the government cited three cases. In Ziegler v. United States, 9 Cir., 1949, 174 F.2d 439, the court held that where a defendant voluntarily takes the stand and testifies concerning some matter, he is open to cross-examination on that matter, and to the extent that he is subject to such cross-examination, he waives the privilege against self-incrimination with reference to that matter. It was in the context of that waiver of his privilege by the client that the court in the Ziegler case said that "appellant's privilege was personal to him and could not be claimed by some one else for him, not even by his counsel." Id., 174 F.2d at page 447. The Ziegler case is clearly not authority for the proposition that an attorney representing a client and acting pursuant to his instructions may not invoke the privilege for him, in the absence of any waiver on the part of the client. In United States v. Shibley, D.C.S.D.Cal.1952, 112 F.Supp. 734, the second case cited by the government, the court decided that a claim of self-incrimination was invalid for two reasons, the first being a waiver, the second being that "Insofar as the questions sought to make Bennette [a stranger to the proceeding] the source of the information, the defendant was not in position [sic] to claim self-incrimination for Bennette. The plea is personal and cannot be invoked on behalf of a third person." Id., 112 F.Supp. at page 749. The only connection between the Shibley case and the proposition contended for by the government here is the fortuitous

fact that the defendant Shibley, an attorney, had previously, in another proceeding, been attorney for Bennette. Obviously, in a subsequent proceeding in which the attorney himself was the defendant, the attorney could not invoke the privilege which his client may have had in a previous proceeding on his own behalf. So far as the Shibley decision rested on grounds other than waiver, it rested on the general and uncontested rule that a defendant in a criminal case may not invoke the privilege against self-incrimination of a stranger to the action.

The third case cited by the government as a holding in its favor is Remmer v. United States, 9 Cir., 1953, 205 F.2d 277. In that case the government had validly obtained certain records from a third party. The accountant for the taxpayer there involved then borrowed these records from the government, on condition that they be returned. Instead of returning them, the accountant turned the records over to the attorney for the taxpayer. Under this set of circumstances, the court held that the attorney could not raise the claim against self-incrimination on behalf of his client. The Court distinguished a case cited by defendant as follows:

"The case of People v. Minkowitz, 1917, 220 N.Y. 399, 115 N.E. 987, referred to for the first time by appellant during oral argument, is distinguishable. That case involved papers originally in the possession of the defendant which had been given to his attorney in the course of an attorney-client relationship. The court held that under those circumstances the possession of the attorney was the possession of the defendant, and the attorney therefore could not be compelled to produce the papers. In the present case, however, the records were not acquired by appellant's counsel from appellant in the course of an attorney-client relationship, but were instead received from the Government subject to the condition that they be returned." Id., 205 F.2d at pages 285, 286.

Thus, on the question of the lack of standing of an attorney to raise the claim of privilege for his client although the client does not himself utter the words effectuating the claim, or is not himself physically present, the government cites no convincing authority. The government apparently seeks to establish a novel rule that unless the client himself participates in hearings such as the one held before the agent of the Internal Revenue Bureau, he waives his Constitutional rights. The government could thus put any taxpayer to the choice of attending hearings or investigations, sometimes carried on over considerable periods of time, or waiving his privilege against self-incrimination. Such a rule would accomplish nothing except to impose a heavy penalty in terms of time and money on those taxpayers who chose to assert their right against self-incrimination under the Constitution. The effective exercise of Constitutional rights should not be abridged by any such technical and onerous requirements as that.

The next argument made by the government relates to the fact that the working papers here involved were originally produced by the accountant. The government claims that these working papers are the property of the accountant, and that therefore taxpayers may not avail themselves of the privilege with respect to those papers. The government relies on Cal.Bus. and Prof. Code, § 5130, which provides:

"Statements, etc., made to client property of accountant. All statements, records, schedules, working papers and memoranda made by a certified public accountant or public accountant incident to or in the course of professional service to clients by such certified public accountant or public accountant except reports submitted by a certified public accountant or public accountant to a client shall be and

remain the property of such certified public accountant or public accountant, in the absence of an express agreement to the contrary between the certified public accountant or public accountant and the client."

This argument assumes that only the legal owner of documents may invoke the privilege against self-incrimination as a bar to requiring him to produce documents in his possession. Counsel for taxpayers, surprisingly, seem to have accepted this argument, and argue that the California statute, as applied to this case, makes taxpayers the legal owners of the documents.

There is no contention by the government that taxpayers or their attorneys are not in rightful, indefinite possession of the documents. This Court has already found that the attorneys were holding the documents for the taxpayers and that their possession of them is the possession of taxpayers, for our purposes. The argument of the government is therefore reduced to the proposition that the application of the privilege against self-incrimination turns on the difference between rightful indefinite possession and legal title. Nothing in the cases substantiates this notion that a narrow concept of property law should determine the availability of Constitutional guarantees against self-incrimination. The Supreme Court has stated the rule as follows:

" * * * the papers and effects which the privilege protects must be the private property of the person claiming the privilege, or at least *in his possession in a purely personal capacity.*" (Emphasis added.) See United States v. White, 1944, 322 U.S. 694, 699, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542.

There is no contention here that the Levys were not holding the documents in a personal capacity. Nothing in the White case or the other cases later to be examined in this opinion suggests anything to the contrary. And if there were doubt, it would be well to take note of the most recent pronouncement of the Supreme Court on the Fifth Amendment:

"It is relevant to define explicitly the spirit in which the Fifth Amendment's privilege against self-incrimination should be approached. This command of the Fifth Amendment ('nor shall any person * * be compelled in any criminal case to be a witness against himself * * * ') registers an important advance in the development of our liberty—'one of the great landmarks in man's struggle to make himself civilized.' Time has not shown that protection from the evils against which this safeguard was directed is needless or unwarranted. This constitutional protection must not be interpreted in a hostile or niggardly spirit. Too many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege. Such a view does scant honor to the patriots who sponsored the Bill of Rights as a condition to acceptance of the Constitution by the ratifying States. The Founders of the Nation were not naive or disregardful of the interests of justice. The difference between them and those who deem the privilege an obstruction to due inquiry has been appropriately indicated by Chief Judge Magruder:

" 'Our forefathers, when they wrote this provision into the Fifth Amendment of the Constitution, had in mind a lot of history which has been largely forgotten to-day. * * * They made a judgment, and expressed it in our fundamental law, that it were better for an occasional crime to go unpunished than that the prosecution should be free to build up a criminal case, in whole or in part, with the assistance of enforced disclosures by the

accused. The privilege against self-incrimination serves as a protection to the innocent as well as to the guilty, and we have been admonished that it should be given a liberal application. \* \* \* If it be thought that the privilege is outmoded in the conditions of this modern age, then the thing to do is to take it out of the Constitution, not to whittle it down by the subtle encroachments of judicial opinion.' Maffie v. United States, 1 Cir., 209 F.2d 225, 227.

"Nothing new can be put into the Constitution except through the amendatory process. Nothing old can be taken out without the same process.

"No doubt the constitutional privilege may, on occasion, save a guilty man from his just deserts. It was aimed at a more far-reaching evil—a recurrence of the Inquisition and the Star Chamber, even if not in their stark brutality. Prevention of the greater evil was deemed of more importance than occurrence of the lesser evil. Having had much experience with a tendency in human nature to abuse power, the Founders sought to close the doors against like future abuses by law-enforcing agencies.

"As no constitutional guarantee enjoys preference, so none should suffer subordination or deletion. \* \* \* To view a particular provision of the Bill of Rights with disfavor inevitably results in a contricted application of it. This is to disrespect the Constitution." (Footnotes and citations omitted.) See Ullmann v. United States, 1956, 350 U.S. 422, 426, 429, 76 S.Ct. 497, 500.

■ But even aside from the construction of the Fifth Amendment to which the Ullmann case enjoins us, the government's argument is too broad. Even assuming that the California statute set out above would govern the point at issue, the property in these documents is clearly in the taxpayers. They directed Wood to turn them over to themselves or their agents, and Wood did so, as he testified, with no intention of retention of any title, or belief that he could get them back. There is no dispute between accountant and client as to who owns the papers. The government relies on the words "express agreement" in the statute, apparently reading it as "express contract" so as to require a contract satisfying the normal standards of an executory contract. There was an express direction by the taxpayers to the accountant to turn over the documents. The accountant complied. Whether this was a gift, a unilateral contract in which the terms were expressly stated by the taxpayers and performed by the accountant, or even an executory contract in which the taxpayers stated the express terms and offered as an implied consideration continued employment of the accountant, is a matter of academic dispute. It is clear enough that there was an express agreement between the accountant and the taxpayers that ownership in the papers should become vested in the taxpayers at the moment of transfer of the papers to the taxpayers' agents. Thus, even under the California statute, the papers are the property of the taxpayers.

The government cites a number of other cases to bar the plea of self-incrimination in this case. Nothing decided here impairs the authority of those cases. The case of Sale v. United States, 8 Cir., 1956, 228 F.2d 682, presenting a similar fact situation, did not concern the privilege against self-incrimination. The application of the Fifth Amendment was neither claimed, argued, nor decided in that case. Nowhere in the opinion is there any reference to it. And in any case, the finding of fact in Sale, unlike the finding in the case at bar, was that the working papers were the property of the accountant, not of the taxpayer there involved.

The case of Falsone v. United States, 5 Cir., 1953, 205 F.2d 734, involved a subpoena requiring the taxpayer's accountant to produce records then held by the accountant. All that that case decides is that there is no accountant-client privilege comparable to the attorney-client privilege in the federal courts when a federal statute requires disclosure. There is no such question in this case. Both sides concede that Wood, the accountant in the case at bar, was bound to comply with the subpoena directed to him, and has done so to the extent of any documents in his possession. The Falsone case likewise presents no adjudication of the claim against self-incrimination, which could not in that case have been raised by the accountant.

The case at bar does not fall within the scope of the so-called public records exception to the privilege against self-incrimination. See United States v. White, 1944, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542; Wilson v. United States, 1911, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771; Hale v. Henkel, 1906, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652. The rationale of those cases has been ably stated in a recent opinion by Judge Irving R. Kaufman. See Matter of Daniels, D.C.S.D. N.Y.1956, 140 F.Supp. 322. The papers involved in the case at bar are obviously not within the public records doctrine. They were not required to be kept by law, nor are they even regular business records of a business or organization subject to the state's power of inspection. They are no more than the private notes of an accountant, rightfully possessed and owned by the persons from whom the government now seeks to extract them, for use in a criminal proceeding against them. The government has cited Shapiro v. United States, 1948, 335 U.S. 1, 68 S.Ct. 1375, 92 L.Ed. 1787. That case concerned records required to be kept by a valid government regulation. It has no bearing on this case.

The zealous prosecution of violations of the criminal laws is the business of the government. But the zealous protection of the liberties of the people should be equally the concern of the government. The field of taxation represents probably the greatest single area of contact between individuals and the force of the state. A slight invasion of the right against self-incrimination in this field has as great and baleful consequences upon the relations between the individual and the state as does an invasion of that right in the more dramatic areas of public life.

The application of the government is denied.