**UNITED STATES of America,**
**Appellant,**

v.

**Harold JUDSON, Appellee.**

**No. 18010.**

United States Court of Appeals
Ninth Circuit.
July 30, 1963.

---

Roger T. Foley, Senior District Judge, dissented.

Francis C. Whelan, U. S. Atty., Timothy M. Thornton, Asst. U. S. Atty., Chief, Special Prosecutions Section, and Robert E. Hinerfeld, Asst. U. S. Atty., Los Angeles, Cal., for appellant.

Harold Judson, Los Angeles, Cal., in pro. per.

Before JERTBERG and DUNIWAY, Circuit Judges, and FOLEY, Senior District Judge.

JERTBERG, Circuit Judge.

Harold Judson, Esq., an attorney practicing in the above entitled District Court, after having been served with a subpoena duces tecum, by authority of Rule 17(c), Federal Rules of Criminal Procedure, 18 U.S.C.A., filed a motion to quash the subpoena on the grounds that the subpoena is unreasonable and oppressive. The subpoena directed Appellee to produce before the Grand Jury the following items:

"1] All paid checks and bank statements of the commercial accounts of Miriam Y. Stacher at the Bank of America, Main Office, Beverly Hills, California, covering the periods November 6, 1952 through December 16, 1954, and March 14, 1958 up to and including the present date;

"2] All paid checks and bank statements of the commercial accounts of Miriam Stacher at the Beverly Hills National Bank, 9600 Santa Monica Boulevard, Beverly Hills, California, for the period June 18, 1952 through November 20, 1952;

"3] All paid checks and bank statements of the commercial accounts of Miriam Stacher at Bank of America, Palm Springs, California, for the period February 7, 1952 through June 28, 1952; and

"4] All work papers, memoranda, computations, and other account-

ing work sheets, prepared by I. George Goldstein, accountant, of Newark, New Jersey, which were made by him during his visit to Los Angeles in September, 1961, and which pertain to the financial transactions of Joseph Stacher."

At the hearing on Appellee's motion to quash, the following undisputed facts were developed. During the summer of 1961, Joseph Stacher learned that he and his wife, Miriam, were under investigation by the Intelligence Division of the Internal Revenue Service for possible charges of tax evasion. In July, 1961, he retained appellee to represent him and his wife in the pending investigation. Appellee advised Stacher that he required a net worth statement of the Stacher's affairs, in order to carry on an adequate representation.

Stacher then retained the services of two accountants, Goldstein and Pally, to prepare the net worth statement appellee had requested. Goldstein, Pally, Stacher and appellee met from time to time in September of 1961. Data used in preparing the statement included the documents mentioned in Items 1, 2 and 3 of the subpoena. When the net worth statement was completed, it and the other documents in question were placed in the hands of appellee for use in rendering the specific professional services requested by his clients. On January 17, 1962 appellee was served with the subpoena duces tecum set out above, which directed him to produce forthwith before the Grand Jury the items mentioned therein.

After the hearing, the District Court, on March 19, 1962, orally granted the motion to quash. On April 6, 1962, the Court filed a written Order granting the motion to quash, incorporating therein the grounds stated by the Court in its oral ruling of March 19, 1962.

On April 17, 1962, Appellant, United States of America, filed a notice of appeal from the oral Order of March 19, 1962, quashing the subpoena and on the same day filed a notice of appeal from the written Order of April 6, 1962.

The reasons given by the Court as the basis for its ruling appear in the oral Order of March 19, 1962. They were as follows:

"The subpoena duces tecum, while having four different numbered items, actually relates to two things different in nature: One of them is groups of checks and bank statements, and the other, Item 4 is all the work papers.

"The motion to quash the subpoena is granted as to Item No. 4, all of the work papers, memoranda, computations and other accounting work sheets prepared by I. George Goldstein during his visit to Los Angeles, * * *, on the ground that it would be a violation, not only of the attorney-client privilege in that these are part of the attorney's work papers, but also on the further ground that it would be a violation of the Fifth Amendment. * * *

"Here all of the evidence is to the effect that these things were gathered together and put in Mr. Judson's hands as the lawyer for the Stachers, for one thing, in connection with the possible violation of the income tax law. So I think that Mr. Judson is (in) the position under the cases to raise the Fifth Amendment on behalf of his clients, and on that ground I grant the motion to quash Items 1, 2 and 3."

It is clear that Item 4 of the subpoena calls for the production of the net worth statement and the various preliminary memoranda which culminated in the net worth statement. This statement was prepared at the attorney's request, in the course of an attorney-client relationship, for the purpose of advising and defending his clients. The accountants' role was to facilitate an accurate and complete consultation between the client and the attorney about the former's financial picture. The lower court was correct in determining that these documents constituted confidential communications within the attorney-client privilege. United States

v. Kovel, 296 F.2d 918 (2nd Cir., 1961); City & County of San Francisco v. Superior Court, 37 Cal.2d 227, 231 P.2d 26, 25 A.L.R.2d 1418 (1951).

■ The cancelled checks and bank statements are not within the attorney-client privilege. These items were negotiable instruments in commerce and were never confidential from the time of their creation. Their transfer from the client to the attorney did not constitute a confidential communication. Colton v. United States, 306 F.2d 633 (2nd Cir., 1962).

■ Therefore, disclosure of Items 1, 2 and 3 of the subpoena could be declined only upon the basis of some other privilege. The only other privilege invoked below was the Stachers' Fifth Amendment privilege against self-incrimination. It is undisputed that the Fifth Amendment was not invoked by either of the Stachers, but by appellee on their behalf. It is also undisputed that these items are of such character that they would not be compellable of either Joseph or Miriam Stacher if an attempt to do so were made and the privilege asserted. However, appellant challenges the standing of appellee to invoke his clients' privilege and to suppress the items on the basis of that privilege.

At issue in this case is the effective exercise of the privilege by one who is clearly entitled to its protection. We are called upon only to consider the method whereby the privilege-holder makes known his desire to assert the privilege.

Appellant tells us that the privilege must be invoked by the privilege-holder himself for the reason that the privilege is "personal." Appellant borrows the phrase "personal privilege" from many cases, the holdings of which we do not question. We do question whether the connotation of "personal" in those cases has much bearing on this problem.

The cases cited by appellant all look for support to three Supreme Court decisions: Hale v. Henkel, 201 U.S. 43,

26 S.Ct. 370, 50 L.Ed. 652 (1905); Wilson v. United States, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 771 (1910); and United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 88 L.Ed. 1542 (1943). These cases develop the doctrine that the Fifth Amendment privilege does not extend its protection to corporations (Hale), or to corporation officials when compelled to produce corporate documents which tend to incriminate themselves (Wilson). These principles also apply in situations involving certain unincorporated associations (White).

In developing the rationale of these doctrines, the Supreme Court placed considerable emphasis upon a distinction between "personal" and "representative." The government argues here that since appellee is the "representative" of the taxpayer, he has no more standing to raise his principal's claim of privilege than did the "representatives" in those cases. This conclusion is a non-sequitur.

The rationale which the Supreme Court developed is that the State and Federal governments have a reserved visitorial power over the conduct of certain organizations, and that such power is not impeded by the fact that the organizations' activities are carried on by persons acting in a non-personal, official and public capacity. Their personal privileges do not embrace activities performed in their non-personal capacities. In United States v. White, supra, the Court said, 322 U.S. at 698–700, 64 S.Ct. at 1251–1252, 88 L.Ed. 1542:

"The constitutional privilege against self-incrimination is essentially a personal one, applying only to natural individuals. * * * Since the privilege against self-incrimination is a purely personal one, it cannot be utilized by or on behalf of any organization, such as a corporation. * * * Moreover, the papers and effects which the privilege protects must be the private property of the person claiming the privilege, or at least in his possession in a purely personal capacity.

Boyd v. United States, 116 U.S. 616 [6 S.Ct. 524, 29 L.Ed. 746]. But individuals, when acting as representatives of a collective group, cannot be said to be exercising their personal rights and duties nor to be entitled to their purely personal privileges. * * * In their official capacity, therefore, they have no privilege against self-incrimination. And the official records and documents of the organization that are held by them in a representative rather than in a personal capacity cannot be the subject of the personal privilege against self-incrimination, even though production of the papers might tend to incriminate them personally. * * *

"The reason underlying the restriction of this constitutional privilege to natural individuals acting in their own private capacity is clear. The scope and nature of the economic activities of incorporated and unincorporated organizations and their representatives demand that the constitutional power of the federal and state governments to regulate those activities be correspondingly effective. * * * The framers of the constitutional guarantee against compulsory self-disclosure, who were interested primarily in protecting individual civil liberties, cannot be said to have intended the privilege to be available to protect economic or other interests of such organizations so as to nullify appropriate governmental regulations."

It appears to us that the Supreme Court in those cases used the term "personal" in the sense of "natural individual," and the term "representative" in the sense of "representative of a non-privileged organization."

We have not been directed to, nor have we found any Supreme Court decision dealing with the precise problem before us now. The closest case is Grant v. United States, 227 U.S. 74, 33 S.Ct. 190, 57 L.Ed. 423 (1912). In that case, a subpoena duces tecum was served upon an attorney directing him to produce corporate documents which had been delivered to him by his client, Burlingame. The court said, 227 U.S. at 79–80, 33 S.Ct. at 192, 57 L.Ed. 423:

"The inquiry thus remains whether in these circumstances Grant [the attorney] could refuse their production if they would tend to incriminate his principal.

"Although the merits of the constitutional question are thus before us, it does not require extended discussion in view of the recent decisions of this court. The books and papers called for by the subpoena were corporate records and documents. * * * They remained subject to inspection and examination when required by competent authority, and *they could not have been withheld by Burlingame himself upon the ground that they would tend to incriminate him.*" (Emphasis added.)

The implication from the quoted portion is that if the client *could* have withheld the documents, a *different question* would exist—a question not entirely answered by the Hale and Wilson doctrines. We feel a different question does exist. Our task is to determine whether a different result obtains.

Several federal decisions contain expressions of opinion favorable to the government's position but there are very few cases in which those expressions are essential to the results reached therein. These cases may be distinguished from the present one upon factual circumstances falling within the following categories.

(1) Cases in which the privilege was asserted by an attorney whose client, the privilege-holder, had waived the benefits thereof. United States v. Willis, 145 F.Supp. 365 (D.Ga.1955) (*semble*); Ziegler v. United States, 174 F.2d 439 (9th Cir., 1949);

(2) Cases in which the privilege was asserted by an attorney concerning

either "required" or "corporate" records, such being outside the scope of the client's privilege. Grant v. United States, supra; United States v. Willis, supra (semble); Falsone v. United States, 205 F.2d 734 (5th Cir., 1953); London v. Everett H. Dunbar Corp., 179 F. 506 (1st Cir., 1910);

(3) Cases in which an attorney asserted the privilege concerning incriminating matter not owned or possessed by his client. In re Fahey, 300 F.2d 383 (6th Cir., 1961); Schwimmer v. United States, 232 F.2d 866 (8th Cir., 1956); Remmer v. United States, 205 F.2d 277 (9th Cir., 1953).

The foregoing cases are all alike in that the client himself could not have raised the privilege. Similarly inapposite are cases where the assertion was made by one not in fact the attorney of the privilege holder. In re Blumenberg, 191 F.Supp. 904 (S.D.N.Y.1960); Sears, Roebuck & Co. v. American Plumbing & Supply Co., 19 F.R.D. 334 (D.Wis.1956).

On the other hand, the court in Application of House, 144 F.Supp. 95 (N. D.Cal.1956), had the question squarely before it. In that case, the taxpayer had instructed his accountant to turn over to his attorney all work sheets pertaining to the taxpayer. The request was made for the purpose of aiding the attorney in representing the taxpayer in a pending tax investigation. In the course of that investigation, an administrative subpoena was served upon the attorney directing him to produce the work sheets. As pre-existing documents, they did not fall within the attorney-client privilege, although the delivery had been made in the course of an attorney-client relationship. Indeed, the entire transaction which brought together the attorney, the taxpayer and his records was for the purpose of preparing a defense to the very investigation upon which the issuance of the subpoena was predicated. The court held that under the circumstances the attorney could rightfully refuse to produce the documents by reason of his client's Fifth Amendment privilege. The court said, 144 F.Supp., at 100:

"Thus, on the question of the lack of standing of an attorney to raise the claim of privilege for his client although the client does not himself utter the words effectuating the claim, or is not himself physically present, the government cites no convincing authority. The government apparently seeks to establish a novel rule that unless the client himself participates in hearings such as the one held before the agent of the Internal Revenue Bureau, he waives his Constitutional rights. The government could thus put any taxpayer to the choice of attending hearings or investigations, sometimes carried on over considerable periods of time, or waiving his privilege against self-incrimination. Such a rule would accomplish nothing except to impose a heavy penalty in terms of time and money on those taxpayers who chose to assert their right against self-incrimination under the Constitution. The effective exercise of Constitutional rights should not be abridged by any such technical and onerous requirements as that."

There are two decisions which expressly purport to be in conflict with Application of House, supra: United States v. Boccuto, 175 F.Supp. 886 (D. N.J.1959), and Bouschor v. United States, 316 F.2d 451 (8th Cir., 1963).

In Boccuto the court had before it accountant's work papers, as did the court in House. However, it was held in Boccuto that the work papers were the property of the accountant and not of the taxpayer. Presumably, therefore, the taxpayer himself could not have resisted their production. Although this factor is clearly distinguishing, the court states with respect to the attorney's standing to invoke the client's privilege that it "must disagree with the conclusions" reached in House. We are unable to determine whether the court in Boccuto held that an attorney

has no standing at all to raise his client's claim of privilege, or whether the lack of possessory interest in the work papers was fatal to the taxpayer's claim, regardless of how invoked.[1]

The Bouschor case was decided by the Eighth Circuit while the instant case was under submission to us. We note that in that case the special agents had examined the work papers in question on a number of occasions prior to the time the attorney acquired them. Moreover, the court indicates that the burden of showing the taxpayer's ownership in the work papers had not been met. The court did not, however, comment on the effect of these circumstances upon the Fifth Amendment question. Although we feel that these factors distinguish the case, we cannot agree with the conclusions stated 316 F.2d 458–459:

> "But the guarantee against self-incrimination has long been characterized as a personal privilege of the witness. 'It was never intended to permit him to plead the fact that some third person might be incriminated by his testimony, even though he were the agent of such person.' Hale v. Henkel, 1906, 201 U.S. 43, 69–70, 26 S.Ct. 370, 377, 50 L.Ed. 652; McAlister v. Henkel, 1906, 201 U.S. 90, 91, 26 S.Ct. 385, 50 L.Ed. 671; United States v. White, 1944, 322 U.S. 694, 704, 64 S.Ct. 1248, 88 L.Ed. 1542; In re Fahey, supra, p. 385 of 300 F.2d. This, it seems to us, is determinative of the Fifth Amendment argument."

█ The raw logic of the matter compels us to agree with the court in Application of House, supra. Clearly, if the taxpayer in this case, or in House, had been subpoenaed and directed to produce the documents in question, he could have properly refused. The government concedes this. But instead of closeting himself with his myriad tax data drawn up around him, the taxpayer retained counsel. Quite predictably, in the course of the ensuing attorney-client relationship the pertinent records were turned over to the attorney. The government would have us hold that the taxpayer walked into his attorney's office unquestionably shielded with the Amendment's protection, and walked out with something less. The way was clear, according to appellant, for an enforcement officer to gather up the evidence which otherwise would have been beyond his reach. The taxpayer's only recourse would be the marathon footwork indicated in House.[1a]

The thrust of the Fifth Amendment is that "prosecutors are forced to search for independent evidence instead of relying upon proof extracted from individuals by force of law." United States v. White, supra, 322 U.S. at 698, 64 S. Ct. at 1251, 88 L.Ed. 1542. The records now in question were not "independent," in the sense that term is used in White, while in the hands of the taxpayer. By what magic did they become "independent" when handed to an attorney for the purpose of effectively representing the taxpayer in an investigation which gives the records significance?

It has been said that since only the privilege-holder knows what will or will not incriminate, he alone knows whether

---

1. The "holding statement" reads as follows, 175 F.Supp. at 890:
   "The Court, therefore, concludes that the attorney does not, under these circumstances, have the right to invoke the privilege against self-incrimination in behalf of his client, and that the work papers are the property of the accountant and must be produced in accordance with the summons."

1a. The House case involved an administrative subpoena. The present case involves a Grand Jury subpoena. Grand Jury proceedings are secret, and presumably the taxpayer could be excluded therefrom. If only the taxpayer may assert the privilege, his dilemma is obvious. Conceivably, he could escape the dilemma by filing in the District Court a motion to quash the subpoena served upon his attorney. See, e. g., United States v. Guterma, 272 F.2d 344 (2nd Cir., 1959). While there may be reason to permit this anomalous procedure, we see no reason to require it.

the privilege should be asserted. This reasoning is akin to the proposition that "no one needs a lawyer to tell him he is right or wrong unless he knows he is wrong."[2] The government, in its brief, does recognize that "the function of the lawyer, here, is to advise on the legal implications of disclosure." (This puts it mildly as the setting "here" is a tax investigation.) Guilty knowledge is no more a prerequisite for the Fifth Amendment's protection than an inference of guilt is a product of its assertion.

The government contends that only the person who might be incriminated knows the full evidentiary facts necessary to determine if the disclosure of the information sought might tend to incriminate him, and that "the courts should not allow this decision to be delegated to an agent." But the decision whether disclosure might tend to incriminate is not made by the privilege-holder, his attorney, the prosecution or the jury. It is made by the court. The process for determining the incriminating character of evidence is plainly set forth in Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). Again we emphasize that the incriminating character of the evidence is not in question in this case.

The government states that the evil which the Fifth Amendment sought to prevent is not present when the prosecution seeks evidence of A's guilt from B. But this argument ignores the realities of the relationship existing where B is A's attorney. An attorney is his client's advocate. His function is to raise all the just and meritorious defenses his client has. No other "third party," nor "agent," nor "representative" stands in such a unique relationship between the accused and the judicial process as does his attorney. He is the only person besides the client himself who is permitted to prepare and conduct the defense of the matter under investigation. The attorney and his client are so identical with respect to the function of the evidence and to the proceedings which call for its production that any distinction is mere sophistry.

The government argues that if the privilege-holder doesn't want the protection offered by the Amendment, law enforcement would be needlessly hampered if someone else were allowed to invoke it. The argument has merit where the hypothesis is correct. But again, the argument loses sight of the attorney's role: as an advocate of the client's position, he is deemed to know that position.

There can be little doubt of the taxpayer's position here. This is not a situation where the privilege-holder thought so little of the privilege, or so doubted its applicability, that he allowed the judicial process to ignore it. The taxpayer knew that his attorney was withholding documents from the grand jury, and he knew the grounds asserted. He was present and testified at the hearing on appellee's motion to quash. True, no one asked him if he desired the result his attorney was so arduously trying to achieve. But if the government thought for one minute that the taxpayer was willing for the information to be disclosed, would it have remained so mute?

We feel that the privilege-holder's mental attitude was sufficiently demonstrated by the circumstances to be consistent with a desire for the protection of the privilege and inconsistent with an inference of waiver. This is enough, when coupled with a timely and effective assertion by the attorney, to invoke the privilege. The privilege must then be respected if the client himself could have successfully raised it.

In 8 Wigmore, Evidence (McNaughton Rev. 1961), § 2307, the following observation is made:

"Is the attorney compellable to *produce in court,* by subpoena or

2. See Simonett "The Common Law of Morrison County", 49 A.B.A.J. 263 (March, 1963).

bill of discovery, the documents placed in his possession by the client?"

\* \* \*

"The answer here depends upon the other privileges of the client *irrespective of the present privilege* [the attorney-client privilege]. The attorney is but the agent of the client to hold the deed. If the client is compellable to give up possession, then the attorney is; if the client is not, then the attorney is not. It is merely a question of possession, and the attorney is in this respect like any other agent. There is, to be sure, the added consideration of policy—namely, that if the attorney were not compellable when the client was, then the client's obligation to produce could always be evaded in very simple fashion by placing the deed with the attorney.
\* \* \*

"It follows, then, that *when the client himself would be privileged* from protection of the document, \* \* \* as exempt from self-incrimination, the attorney having possession of the document is not bound to produce. Such has invariably been the ruling. On the other hand, if the *client would be compellable* to produce \* \* \* then the attorney is equally compellable, if the document is in his custody, to produce under the appropriate procedure." (Original italics.)

See also Colton v. United States, 306 F. 2d 633, 639 (2nd Cir., 1962), and Brody v. United States, 243 F.2d 378, 387 (1st Cir., 1957).

Few areas of the law draw so many individuals in contact with governmental powers as does federal taxation. Yet this branch is one of the thickest of the law's "bramble bush." The ramifications of tax law are often a stubborn challenge to the most expert legal practitioner. The very nature of the tax laws requires taxpayers to rely upon attorneys, and requires attorneys to rely,

in turn, upon documentary indicia of their clients' financial affairs. In light of these realities a very real danger would be created if we were to sustain the government's position. That danger was apparent to Judge Murphy in Application of House, supra, when he spoke of "heavy penalties."

The government has at its disposal inquisitorial powers and administrative procedures which it may invoke at its pleasure. If the government's position were sustained here, those powers could be utilized to stimulate a taxpayer's consultation with his attorney and the predictable transfer of his records. The government's powers could then be utilized to compel disclosure of those matters by the attorney whenever the taxpayer were not available to utter the magic words. In our judgment, the inherent power thus to compel indirectly an individual's self-incrimination is curbed by the Fifth Amendment as effectively as the power to compel the same result directly.

The judgment of the District Court is affirmed.

ROGER T. FOLEY, Senior District Judge (dissenting).

As stated in the prevailing opinion, the production before the Grand Jury of Items 1, 2 and 3 of the subpoena duces tecum, cancelled checks and bank statements of the commercial accounts of Miriam Y. Stacher, could not be successfully resisted by reason of an attorney-client privilege, and the majority in effect holds that disclosure of Items 1, 2 and 3 of the subpoena could be declined by reason of the invocation of the Fifth Amendment by Mr. Judson as the then acting attorney of Joseph Stacher, the husband of Miriam Stacher.

It is undisputed that the Fifth Amendment was invoked not by either of the Stachers, the clients of Appellee, but by Mr. Judson in behalf of his clients. In discussing the application of the Fifth Amendment, we should keep in mind that it appears from Judge Hall's oral Order of March 19, 1962, that the portion of

the subpoena relating to Items 1, 2 and 3 was quashed solely upon the ground that "* * * Mr. Judson is [in] the position under the cases to raise the Fifth Amendment on behalf of his clients and on that ground I grant the motion to quash Items 1, 2 and 3."

As to Item 4, Judge Hall held in his oral opinion:

"The motion to quash the subpoena is granted as to Item No. 4, all of the work papers, memoranda, computations and other accounting work sheets prepared by I. George Goldstein during his visit to Los Angeles, * * *, on the ground that it would be a violation, not only of the attorney-client privilege in that these are part of the attorney's work papers, but also on the further ground that it would be a violation of the Fifth Amendment. I am satisfied that a lawyer can raise the Fifth Amendment under the circumstances in this case."

I cannot agree with the conclusion that the attorney Harold Judson, could invoke the Fifth Amendment as attorney for and on behalf of the Stachers.

In the course of his opinion, Mr. Justice Brown, speaking for the Supreme Court, in Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652, 663, stated:

"The right of a person under the Fifth Amendment to refuse to incriminate himself is purely a personal privilege of the witness. It was never intended to permit him to plead the fact that some third person might be incriminated by his testimony, even though he were the agent of such person. A privilege so extensive might be used to put a stop to the examination of every witness who was called upon to testify before the grand jury with regard to the doings or business of his principal, whether such principal were an individual or a corporation. * * * The Amendment is limited to a person who shall be compelled in any criminal case to be a witness against himself, and if he cannot set up the privilege of a third person, he certainly cannot set up the privilege of a corporation. * * * Indeed, so strict is the rule that the privilege is a personal one that it has been held in some cases that counsel will not be allowed to make the objection. We hold that the questions should have been answered."

It affirmatively appears that none of the matters and documents which Appellee Judson was required to produce by virtue of the subpoena duces tecum were the private property of Appellee. Such a circumstance and other questions pertinent here in connection with the application of the Fifth Amendment were considered by the Supreme Court of the United States in United States v. White, 322 U.S. 694, 699, 64 S.Ct. 1248, 88 L.Ed. 1542. There the Supreme Court commented:

"* * * Moreover, the papers and effects which the privilege protects must be the private property of the person claiming the privilege, or at least in his possession in a purely personal capacity."

The subject matters of the subpoena duces tecum were in Appellee's possession in a representative capacity as an attorney or agent of the Stachers and not "in a purely personal capacity."

Greatly relied upon by Appellee is the case of Application of House, D.C., 144 F.Supp. 95. In that case Judge Murphy of the Northern District of California, Southern Division, apparently held that an attorney would be permitted to raise claim of privilege against self-incrimination on behalf of his client, in proceeding upon complaint of Government seeking authority to investigate taxpayers' records for past years to determine if taxpayers had fraudulently attempted to evade payment of income tax for certain years. The Judge in his consideration of the application of the Fifth Amendment stated, in part, as follows, on p. 99 of 144 F.Supp.:

"[4] * * * The substantial question in this case is whether

the government is seeking an order for production of documents which would violate the taxpayers' privilege against self-incrimination as guaranteed by the Fifth Amendment to the Constitution.

"The government attacks, first, the standing of the attorneys to invoke the privilege on behalf of their clients. In the citation of cases to support its position, the government has been more zealous than accurate. In support of the statement that 'this privilege may not be claimed * * * by an attorney on behalf of his client', the government cited three cases. In Ziegler v. United States, 9 Cir., 1949, 174 F.2d 439, the court held that where a defendant voluntarily takes the stand and testifies concerning some matter, he is open to cross-examination on that matter, and to the extent that he is subject to such cross-examination, he waives the privilege against self-incrimination with reference to that matter. It was in the context of that waiver of his privilege by the client that the court in the Ziegler case said that 'appellant's privilege was personal to him and could not be claimed by some one else for him, not even by his counsel.' Id., 174 F.2d at page 447. The Ziegler case is clearly not authority for the proposition that an attorney representing a client and acting pursuant to his instructions may not invoke the privilege for him, in the absence of any waiver on the part of the client."

In Ziegler v. United States, 174 F.2d 439, 446, Judge Mathews, speaking for the Court, stated:

"[8, 9] Appellant contends that, in permitting appellee's counsel to call upon appellant to produce the checks and in requiring appellant to produce them, the trial court denied to appellant his constitutional privilege against self-incrimination. We reject this contention for the following reasons:

"Appellant voluntarily took the stand and testified as a witness for himself. He thus became subject to cross-examination like any other witness and, to that extent, waived his privilege against self-incrimination. * * *

"[11] It is true that appellant's counsel objected to the production of the checks, but that objection cannot be regarded as a claim of appellant's privilege against self-incrimination, for appellant's privilege was personal to him and could not be claimed by some one else for him, not even by his counsel."

Whether Judge Mathews' comment to the effect that Ziegler's claim of privilege against self-incrimination was personal to him and could not be claimed by someone else for him, not even by his counsel, was necessary to the decision of the case or mere dictum, it nevertheless was a correct statement of the universally recognized rule that the privilege accorded by the Fifth Amendment against self-incrimination is personal to the witness and cannot be claimed by someone else for him.

The fact that the witness in the Ziegler case may have waived his right to immunity under the Fifth Amendment by voluntarily testifying, or waived immunity in some other manner, such waiver by a witness cannot reasonably be held to affect the rule that invocation of the Fifth Amendment must be made personally by the witness and not by another in his behalf. It certainly cannot affect the application of the rule in this case for the simple reason that Judge Hall quashed the subpoena as to Items 1, 2 and 3 solely by reason of the invocation by Stacher's attorney of the Fifth Amendment in behalf of Stacher. It must not be implied that because Mr. Judson might properly invoke the attorney-client privilege that he might on behalf of his client invoke the privilege against self-incrimination guaranteed by the Fifth Amendment.

In London v. Everett H. Dunbar Corporation, 179 F. 506, on 510, the fol--

lowing from the opinion of the Circuit Court of Appeals of the First Circuit:

"The defendant corporation objected to testimony offered for the plaintiff from the treasurer of the defendant corporation. The defendant objected upon the ground, first, that the witness was privileged as an officer of the corporation from giving any testimony tending to connect it with the alleged acts complained of. This was clearly unsound. See Hale v. Henkel, 201 U. S. 43, 26 Sup.Ct. 370, 50 L.Ed. 652. And, further, that he was privileged from answering any inquiry the answer to which might subject him to a penalty; but this privilege was not claimed by the witness on his own behalf but claimed by counsel for the defendant on behalf of the defendant corporation. It is unnecessary to cite authority to sustain the proposition that such a claim of privilege cannot be asserted by a third person. This exclusion of testimony was erroneous."

In United States v. Johnson, 76 F. Supp. 538, 540, Judge Fee, presiding in the Middle District of Pennsylvania, expressed his views on our question as follows:

"[2–6] The privilege against self-incrimination is neither accorded to the passive resistant, nor the person who is ignorant of his rights, nor to one indifferent thereto. It is a fighting clause. Its benefits can be retained only by sustained combat. It cannot be claimed by attorney or solicitor. It is valid only when insisted upon by a belligerent claimant in person."

Judge Fee cited McAlister v. Henkel, 201 U.S. 90, 26 S.Ct. 385, 50 L.Ed. 671, and other cases in support of his view.

In In re Knickerbocker Steamboat Co., 136 F. 956, District Judge Adams, of the Southern District of New York, held that "the constitutional privilege of a witness not to be compelled to give evidence which may incriminate him is personal, and cannot be invoked by counsel as a ground of exception to interrogatories propounded in a pleading."

The three cases just above quoted from were cited evidently with approval by Judge Mathews in Ziegler v. United States, supra.

In In re Brumbaugh, 62–2 USTC, Para. 9521, 9 A.F.T.R.2d 1748, Judge Byrne, of the Southern District of California, Central Division, had under consideration a case strikingly similar to this case. Judge Byrne's findings of fact and conclusions of law pertinent here are the following:

"FINDINGS OF FACT

"1) On May 7, 1962, the Grand Jury for the Southern District of California, sitting at Los Angeles, caused a subpoena duces tecum to be served upon G. Vernon Brumbaugh, Esquire, an attorney-at-law and a member of the Bar of this Court.

"2) This subpoena was returnable before the Grand Jury on May 9, 1962, and directed him to bring with him before the Grand Jury:

" 'All cancelled checks and bank statements relative to expenses or payments incurred during the years 1959 and 1960, including but not limited to direct or indirect financial transactions between you and Glasser Brothers Pioneer Bail Bondsmen, Irving G. Glassers, Louis Glasser, or any member, employee, or agent of that firm, for said years.'

"3) On May 9, 1962, Mr. Brumbaugh filed the instant motion to vacate and quash or modify the subpoena duces tecum; pending the determination of this motion, his appearance before the Grand Jury was deferred.

"4) The motion was based upon three grounds:

"a. The subpoena called for checks, the production of which might tend to incriminate undis-

closed professional clients of the witness, in violation of his clients' privileges against compulsory self-incrimination.

"b. Some of the checks called for by the subpoena were protected by the attorney-client privilege for confidential communications.

"c. The subpoena was exploratory in its nature and failed to specify which checks or transactions are the object of the Grand Jury inquiry.

"5) The witness did not assert that production of these documents might tend to incriminate himself.

"CONCLUSIONS OF LAW

"[1] 1) * * *

"2) An attorney-at-law may not decline to produce before the Grand Jury documents in his custody on the ground that their production might tend to incriminate one or more of his clients. The privilege against compulsory self-incrimination guaranteed by the Fifth Amendment of the Constitution is a personal privilege. It may not be invoked in behalf of a third party, even if the witness is an attorney and he asserts the privilege in behalf of his client.

\* \* \* \* \* \*

"ORDER

"Upon the attached Findings of Fact and Conclusions of Law,

"It Is Hereby Ordered, Adjudged, and Decreed that the motion to vacate and quash or modify the Grand Jury's subpoena duces tecum served upon G. Vernon Brumbaugh on May 7, 1962, for his appearance on May 9, 1962, which motion was filed in this Court on May 9, 1962, is denied."

In United States v. Willis, D.C.M.D. Georgia, 145 F.Supp. 365, Judge Bootle held that the privilege against self-incrimination cannot be claimed by attorney or solicitor and is valid only when insisted upon by a belligerent claimant in person. His opinion reviews cases above cited and quoted from, and other cases, not only dealing with the Fifth Amendment, but with the claimed attorney-client privilege for confidential communications. He stated:

"[1] The right of a lawyer not to disclose the confidential communications of his clients and the right against self-incrimination are different rights. Grant v. United States, 227 U.S. 74, 33 S.Ct. 190, 57 L.Ed. 423.

"The facts here in this regard are as they were in United States v. Johnson, D.C., 76 F.Supp. 538, 540, where the Court said:

"'At the hearing before the judge he did not clearly indicate that he was standing upon a right against self-incrimination, but indicated he was standing upon the right of a lawyer not to disclose the confidential communications of his clients. In any event, he did turn the books and papers over after the hearing before the judge and did not pursue any other remedy.'

\* \* \* \* \* \*

"The claim asserted by Mr. Willis at both hearings is not against incrimination of his client under the Fifth Amendment but is an assertion of the right not to disclose privileged or confidential communications between client and attorney. That claim is untenable. The Supreme Court so decided in Grant v. United States, supra [227 U.S. 74, (79) 33 S.Ct. 192, (57 L.Ed. 423)], stating concisely, 'These were independent documents. Even if they had been received by Grant as attorney for purposes of consultation, they could not be regarded as privileged communications.'

"The recent case of Falsone v. United States, 5 Cir., 205 F.2d 734,

739, is also conclusive and controlling on this point:

"'The books and papers of a taxpayer, even though received by an attorney for purposes of consultation, cannot be regarded as privileged communications. (Footnote 9, supra). Grant v. United States, 227 U.S. 74, 79, 33 S.Ct. 190, 57 L.Ed. 423; 58 Am. Jur., Witnesses, Sec. 501. According to the last cited text, "The reason is obvious; the administration of justice could easily be defeated if a party and his counsel could, by transferring from the one to the other important papers required as evidence in a cause, thereby prevent the court from compelling the production of important papers on a trial." Or, as more succinctly stated, "If documents are not privileged while in the hands of a party, he does not make them privileged by merely handing them to his counsel." Edison Electric Light Co. v. United States Electric Lighting Co., C.C.N.Y., 44 F. 294, 297; Id., 45 F. 55. It seems clear, therefore, that, even if we should consider the relation between a taxpayer and his certified public accountant as confidential as that between client and attorney, the accountant would, nevertheless, be required to produce the books and records of the taxpayer.'

"The Supreme Court in the case of Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 440, 95 L.Ed. 344, 345, stated:

"'If petitioner desired the protection of the privilege against self-incrimination, she was required to claim it. United States v. Monia, 1943, 317 U.S. 424, 427, 63 S.Ct. 409, 410, 87 L.Ed. 376, [379]. The privilege "is deemed waived unless invoked." United States v. Murdock, 1931, 284 U.S. 141, 148, 52 S.Ct. 63, 64, 76 L.Ed. 210, [212] [82 A.L.R. 1376].

Furthermore, the decisions of this Court are explicit in holding that the privilege against self-incrimination "is solely for the benefit of the witness," and "is purely a personal privilege of the witness." * * *'

\*   \*   \*   \*   \*   \*

"[7]   But even if we were to rule that the attorney can make for his client the claim of privilege against self-incrimination under the Fifth Amendment, such claim in this case would not prevail. As was pointed out in the Falsone case, supra, 26 U.S.C.A. § 54(a) requires the taxpayer to keep records and the Commissioner, for the purpose of ascertaining the correctness of any return, is authorized by any officer or employee of the Bureau to examine the taxpayer's books and records and to require the attendance of the person rendering the return and the taking of his testimony, 26 U.S.C.A. § 3614. The Falsone case points out further that statutes granting such authorities have been held constitutional as against the contentions that they provide for unreasonable searches and seizures and compel the taxpayer to be a witness against himself."

In Bouschor v. United States, 8 Cir., 316 F.2d 451, 456, decided April 22, 1963, Circuit Judge Blackmun, affirming District Judge Dennis Donovan, D.C., 200 F.Supp. 541, stated:

"[2]   *The attorney-client privilege.*   Bouschor's first point on the merits is that the work papers in question were privileged communications between him and his client O'Brien and that the attorney-client privilege *is applicable to prevent their review by the Service.*

"We think the point is not well taken. We note that, concededly, (a) the work papers were prepared by the accountants and not by the taxpayer; (b) they were in existence prior to Bouschor's appearance in the case as attorney for the tax-

payer;[1] and (c) they had already been reviewed by agents Kaufer and Falconer. Under these circumstances we feel it is unnecessary to decide whether, in connection with an Internal Revenue Service investigation, the privilege is one to be determined under federal law, as the government suggests, citing Falsone v. United States, supra, 5 Cir., 205 F.2d 734, 741–742, and In re Albert Lindley Lee Memorial Hosp., supra, 2 Cir., 209 F.2d 122, 123, to which we may add Colton v. United States, 2 Cir., 1962, 306 F.2d 633, 636, cert. denied 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499, or under Minnesota law, Minnesota Statutes Annotated § 595.02, as Bouschor urges, citing Baird v. Koerner, 9 Cir., 1960, 279 F.2d 623, 632, a case with which the Second Circuit, in Colton v. United States, supra, says flatly, 'we do not agree', for we conclude that the result must be the same under either standard. Compare United States v. Summe, E.D.Ky., 1962, 208 F.Supp. 925, 926–927.

"[3] a. Clearly if the work papers were the property of the accountants in the sense that they were owned by them and not by the taxpayer or Bouschor, no claim of privilege could prevail. This court specifically so held in Sale v. United States, supra, p. 686 of 228 F.2d, where an attorney having possession of an accountant's work papers was asserting the privilege. In accord are In re Fahey, supra, 6 Cir., 300 F.2d 383, 385, affirming D.C., 192 F.Supp. 492, 495, and United States v. Boccuto, D.N.J., 1959, 175 F.Supp. 886, appeal dismissed, 3 Cir., 274 F.2d 860. The district court made no finding as to ownership of these papers and on this record we are not fully assured as to their ownership after the delivery by the accountants to Bouschor. When Bouschor wrote the accountants for the papers he asked only 'if you would send me all of the papers'. Both Stillman and Oase in their affidavits say merely that they have 'relinquished their right(s) to the return or possession of' them, and we have already noted that the government concedes that rightful indefinite possession of the papers was in Bouschor. But these statements, singly or in the aggregate, do not specifically deny the accountants' ownership. They are directed rather to possession. Is a trier of fact to imply from them that ownership remains in the accountants or that they have abandoned any property interest in them, or that title in some way has leaped to O'Brien or to Bouschor? Because one claiming the privilege has the burden of establishing it, [citing cases], we have no hesitancy in concluding that this burden has not adequately been sustained here. Compare United States v. Boccuto, supra, pp. 888 and 890 of 175 F.Supp., where an accountant's affidavit stated that he had turned work papers over to counsel 'with no intention of retention or any title or belief that I can get them back', and the court held there was no clear demonstration that the work papers were the property of the taxpayers 'despite the affidavit filed herein'. We need not decide what the situation would be if the work papers were clearly shown to be the property of the taxpayer or of Bouschor. See Application of House, N.D.Cal., 1956, 144 F.Supp. 95.

\* \* \* \* \* \*

"[8] *The Fifth Amendment.* Bouschor claims the right to assert on behalf of O'Brien the Amendment's protection against self-incrimination. He cites Application of House, supra, N.D.Cal., 1956, 144 F. Supp. 95. That case does indeed in-

---

1. With the exception of the net worth statement prepared at the request of Mr. Judson, the work papers here were in existence prior to Mr. Judson's employment.

-volve facts similar to those here. It is authority against Bouschor's position on the attorney-client issue and on the Fourth Amendment issue but it is favorable to him with respect to the Fifth Amendment. Directly opposing the House case is United States v. Boccuto, supra, D.N.J., 1959, 175 F.Supp. 886. There the court observed that House was on 'all fours', that the taxpayers were not parties, and that it 'must disagree with the conclusions' reached in House.

"[9] On this point we agree with Boccuto and disagree with House. We realize that the Fifth Amendment's provision against self-incrimination 'must be accorded liberal construction in favor of the right it was intended to secure'. [Citing cases.] But the guarantee against self-incrimination has long been characterized as a personal privilege of the witness. 'It was never intended to permit him to plead the fact that some third person might be incriminated by his testimony, even though he were the agent of such person'. [Citing cases.] This, it seems to us, is determinative of the Fifth Amendment argument."

I am of the opinion that the word "personal", as used in the cases above cited regarding the invocation of the Fifth Amendment, is to be understood in its ordinary meaning and acceptation and not as indicated in the majority opinion.

The above quotations from Bouschor are applicable and in point here. There is a striking similarity between that case and the one we have before us. It is of no moment that the proceeding in this case was initiated by a subpoena duces tecum requiring production of documents before a Grand Jury and was not a proceeding under §§ 7602, 7603 and 7604 of the Internal Revenue Code, 26 U.S.C.A., to enforce a subpoena requiring the production of certain documents for the examination by the Bureau of Internal Revenue. The interpretation and application of the Fourth and Fifth Amendments to the Constitution would be the same regardless of which of the procedures were followed.

It is apparent that there has been no violation of the Sixth Amendment to the Constitution.

Compliance with the subpoena would not be unreasonable and/or oppressive.

From the foregoing I conclude that the District Court erred in granting the motion to quash the subpoena duces tecum as to Items 1, 2 and 3 and also erred in granting the motion to quash as to Item 4.

I would reverse.